## MATANUSKA VALLEY FARMERS COOPERATING ASS'N v. MONAGHAN.

### No. 12544.

United States Court of Appeals
Ninth Circuit.
April 26, 1951.
Rehearing Denied June 11, 1951.

Davis & Renfrew, Anchorage, Alaska, Houghton, Cluck, Coughlin & Henry, Seattle, Wash., for appellant.

George B. Grigsby, Anchorage, Alaska, for appellee.

Before HEALY and ORR, Circuit Judges, and LEMMON, District Judge.

ORR, Circuit Judge.

Appellant (hereinafter referred to as the Cooperative) appeals from a judgment enforcing the terms of a written contract, the provisions of which, the Cooperative contends, do not govern the relations of the parties.

The Cooperative is a corporation organized under the laws of Alaska for the purpose of buying, selling, handling and processing agricultural products on a cooperative basis for the benefit of its shareholder-members. The members agreed to sell to the Cooperative, and the Cooperative agreed to purchase, all the produce of the members. Such materials as were needed in the handling and processing of the produce which were not supplied by the members were purchased by the Cooperative from other persons. In addition, the Cooperative maintained consumer departments, selling to the members goods purchased from the members or from others. For purposes of administration, the various aspects of the business were broken down into "departments", namely, the Dairy Creamery Department, the Produce Department, the retail store, etc.

The producing departments purchased the produce of the members, processed it if necessary, and resold it. Ordinarily, the produce of any individual member would be mingled with like produce of other members, so that it was impossible to allocate to the produce of any individual member the proceeds from the resale of his produce. For example, potatoes would be mingled with potatoes, and milk with milk. On the other hand, the produce of an individual member would not be mingled with unlike produce. Hence, a determination could be made as to the proceeds from the resale of the produce allocable to each type of produce subject to expenses incurred in handling and processing. The operation of the consumer departments was in all relevant respects analogous to that of the producing departments.

Appellee is a dairyman, or milk-producer, and the assignee of others similarly situated. These dairymen sold milk during the fiscal year 1945 to the Dairy Creamery Department and were paid twice a month on the basis of the amount of milk thus produced. They instituted this action to recover additional payments allegedly due for such milk. The trial court decided the case on what it deemed to be the requirements of the written contract. We think that contract was, subsequent to its execution, modified by the acts of the parties and by mutual consent.

The written contract between the members and the Cooperative provided that producers were to be paid in either of two ways:

(1) Under Paragraph (8),[1] if the produce was to be processed into a new product, the Cooperative might at its discretion pay a flat delivery price to the producer in full payment; or

[1] "(8) The Association is hereby authorized to process or manufacture into changed or new products the products delivered hereunder and pay the producer as provided for in Paragraph 7, from the proceeds from resale of the changed or new products or at its discretion to pay a flat delivery price therefor to the producer as full payment thereof and thereafter process or manufacture it into changed or new products on its own account and at its own expense as its own product and sell and retain the full proceeds thereof as amounts belonging to the Association."

(2) Under Paragraph (7),[2] the Cooperative agreed to pay the producer his share of the amount received on resale of the pooled products, after making deductions to cover the following items:

(a) repayment of "advances" (and interest thereon), if any, made to the producer during the year to enable him to meet his current expenses;

(b) "reasonable charges" for handling and selling the produce;

(c) "operating and maintenance expenses";

(d) other deductions which have no bearing on the present controversy.

As one of its contentions the Cooperative argues that the transactions of the parties were governed by Section 8 of the contract. The District Court held this section inapplicable in determining the payment to which the dairymen were entitled for milk sold to the Cooperative in 1945. We agree. The evidence is clear that neither the dairymen nor the officers of the Cooperative at any time elected to proceed in accordance with Paragraph 8. The procedure adopted by the parties, as hereinafter outlined, was quite different from that prescribed in Section 8 because the payments received by the dairymen twice a month were not the "final" payments contemplated therein. On the contrary, they were partial payments to be supplemented at the end of the fiscal year by further payments, if (a) the Cooperative made a profit for the year,

and (b) the accounting system in use and later in this opinion described, allocated to a given department a book profit for the year. These supplemental payments, when made, were payments for produce delivered to the Cooperative, and not dividends. In distributing its annual profits the Cooperative made no effort to comply with the Alaska laws governing payment of dividends.

The District Court concluded that Paragraph 7 was applicable and relied on the testimony of certain of the dairymen that they understood they were to be paid in accordance with Paragraph 7; also, the testimony of at least one of the former officers of the Cooperative that the Cooperative had endeavored to follow Paragraph 7 as closely as possible. The District Court adopted the accounts of the Cooperative (prepared for the purpose of allocating the net profit of the Cooperative, as hereinafter shown) to reflect the income and deductions attributable to the Dairy-Creamery Department under Paragraph 7. Thus, the dairymen were considered entitled to the entire book profit credited to the Dairy-Creamery Department ($53,793.-83) for 1945, although the net profits of the Cooperative were $2,889.27.

We need not decide whether this accounting system satisfies the provisions of Paragraph 7 because the parties chose to abandon the contract as written and act under a modification thereof. It is not disputed that the Cooperative has at no

2. "(7) The Association agrees to pay or cause to be paid through its Management and Sales Agency to the Producer the amounts received for the said resale of said products sold separately or the amounts representing Producer's interest in products resold wherein his products are pooled or co-mingled with others as provided for in Paragraph 6 herein after making deductions to cover the following items in connection therewith: (a) repayment of advances made to Producer under Paragraph 4 of this contract and interest on said advances; (b) reasonable charges for the services of receiving, handling and selling said agricultural products under Paragraph 5 of this Contract; (c) operating and maintenance expenses; (d) one dollar each year in payment of the official publication of the Association in case said publication is is-

sued; (e) two per centum (2%) of the gross sales price received for the products of said member sold separately or of the amounts representing said member's interest in products sold wherein his products are pooled or co-mingled with others as funds belonging to the Association to meet its indebtedness and additional expenses, contribute to the Association's reserves (with which to acquire ownership of industries and enterprises and property in connection therewith and for other proper purposes), to pay interest on capital stock by way of dividends and for other proper purposes as provided for by the laws of Alaska pertaining to "Cooperative Associations" under which the Association has been incorporated and by the By-laws of the Association."

time paid the dairymen in accordance with the provisions of Paragraph 7. It has made no effort to return to the dairymen, in accordance with that paragraph, the proceeds fairly attributable to the milk sold by them to the Cooperative, less appropriately attributable deductions.

On the contrary, the Cooperative has, without exception, made flat payments to the dairymen periodically, without regard to the proceeds which would in fact be realized. Twice a month each dairyman was paid an amount computed by multiplying the amount of produce delivered to the Cooperative by a "price" fixed by the officers of the Cooperative. This price was changed from time to time, as conditions varied. Similar periodic payments were made to other producers during the year. In addition, the net profits of the Cooperative at the end of each fiscal year were distributed annually. From the gross income of the entire Cooperative were subtracted all expenses of the entire Cooperative, including the amounts paid during the year to the producers for produce purchased by the Cooperative. The Cooperative never, in any year, distributed more than its net profits so computed.

In distributing these profits, some effort was made to return them to those producers who were deemed to have earned them. They were first allocated to the various "departments," on the basis of a haphazard accounting system characterized by the court below as "primitive." Each department was credited with the proceeds from the sale of products handled or processed by it. From this credit was subtracted:

(a) The "cost of goods sold", that is, the amounts paid twice a month to members for goods purchased from them by the department, plus amounts paid others for other goods purchased by the department;

(b) Current overhead which the accountants thought "directly" attributable to that department, for example, salaries of personnel employed exclusively in that department; and

(c) A percentage of the remaining overhead, allocated among the various departments in proportion to the gross sales of each department.

In this rather arbitrary manner, it was determined that each department had made a profit or loss for the fiscal year. Those departments charged with losses did not share at all in the net profit of the Cooperative. However, these departmental "losses" apparently were not carried over from year to year, and no effort was made to recover the amount of the loss from those producers who had received payments during the year for produce purchased by the "losing" departments. Since these payments were not related to or limited by the proceeds ultimately realized on the resale of the produce, they could not be the type of "advances" contemplated by Paragraph 7.

The net profit of the Cooperative was allocated among those departments credited, as above described, with "profits," in proportion to the book profits thus computed. Once allocated to a given department, these profits were distributed to the individual members in proportion to the amounts of produce sold by them to the department. In short, the Cooperative has invariably regarded the periodic payments as flat, irrevocable payments, and has distributed in addition the net profits of the entire Cooperative. No attempt has been made to return to the individual producer the proceeds from the resale of his produce.

Since the parties to the contract have in fact followed this method of payment from the outset and have made no attempt to conform to the provisions of Paragraph 7, they must be deemed to have modified the written contract by mutual agreement. It is well established that parties to a contract can, by mutual agreement, modify or rescind a contract and adopt in its stead a new agreement. An agreement to change the terms of a contract may be shown by the conduct of the parties, as well as by evidence of an explicit agreement to modify.[3] Appellee urges the as-

3. Cf. 3 Williston on Contracts, § 623, n. 6, 1936 ed.; Restatement Contracts, § 408 (1932); Whitehurst v. FOX Fruit & Vegetable Service, 1944, 224 N.C. 628, 32 S.E.2d 34, 39; City Messenger & Delivery Co. v. Postal Telegraph Co., 1915, 74

910

serted belief of the dairymen that they were selling under the provisions of Paragraph 7 in opposition to a finding of modification by mutual consent. This opinion as to the interpretation of the written contract is not controlling. They knew the manner in which they were in fact being paid and acquiesced therein. They were aware that the periodic payments received by them during the year were at a flat rate on the amount of milk sold to the Cooperative. They knew the payments were irrevocable, even though they should ultimately exceed the net income allocated to them at the end of the year. In fact, in its first year of operation, 1940, the Dairy-Creamery Department apparently was run "at a loss," according to the books of the Cooperative, and the dairymen did not, nor were they requested to, repay the excess received.

Similarly, despite their individual denials of actual knowledge, the dairymen cannot escape being charged with knowledge of the fact that the Cooperative was distributing annually only the profits of the entire Cooperative, not all the book profits of those departments showing a profit. They were aware that the Cooperative was organized to remain in business, not to bleed itself out of existence. They also knew, or should have known, that producers who appeared to have benefited from the ostensibly excessive payments by those departments which reflected a book loss were not required to repay the excess. They must, therefore, be charged with knowledge that this book loss was made up from the book profits of the other departments before the net profit of the Cooperative was distributed.

The circumstances of the operation of the Cooperative demonstrate that the parties agreed to modify the written contract, substituting therefor another method of payment. The dairymen have in the past acquiesced in, and substantially benefited from, the payment methods to which they now object. Apparently one of the principal factors in converting the dairy department from a losing enterprise into a profitable one was the construction of the dairy-creamery plant at Anchorage. This construction was financed by the funds of the entire Cooperative. The cost apparently was not allocated to the Dairy Department, as distinguished from the other departments. This method of bookkeeping tends to exaggerate the amount of "profits" attributable to the dairy products. Having benefited from this exaggeration each year in the past the dairymen should not now be permitted to repudiate the basic principles governing the operation of the Cooperative. The appellee should not be permitted to modify the contract when it is to his benefit to do so and then reinstate it and insist upon strict performance when that position would benefit him most. We think that is what he is attempting to do here.

Judgment reversed.

Or. 433, 145 P. 657; Saul v. McIntyre, 1948, 190 Md. 31, 57 A.2d 272, 274; Mar-golys v. Mollenick, Sup.Ct.N.Y., 1906, 98 N.Y.S. 849.