**C. A. LAYSTROM et al., Plaintiffs-Appellants,**

v.

**CONTINENTAL COPPER & STEEL IN-DUSTRIES, Inc., a Delaware corporation, Defendant-Appellee.**

**No. 11668.**

United States Court of Appeals Seventh Circuit.

May 7, 1957.

Rehearing Denied June 14, 1957.

Frank D. Mayer, Louis A. Kohn, Leo F. Tierney, Harry Adelman, Chicago, Ill., for plaintiffs-appellants, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.

Charles R. Sprowl, Whitney Campbell, E. Marvin Buehler, Chicago, Ill., for de-

fendant-appellee, Taylor, Miller, Busch & Magner, Chicago, Ill., of counsel.

Before MAJOR, LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Plaintiffs (sometimes referred to as the sellers) are 31 persons who, together with 11 other persons, on July 22, 1944 entered into an agreement to sell to Chester A. Bowles practically all of the outstanding shares of capital stock of Quality Hardware and Machine Corporation (herein referred to as Quality). In 1946 Bowles assigned his interest to defendant.

Plaintiffs brought this suit on September 5, 1951 to recover what they claimed was due them on the purchase price. After a trial without a jury, the district court entered a judgment for defendant on July 29, 1955, and thereafter denied plaintiffs' motions to set aside the court's prior findings of fact and conclusions of law, to vacate the judgment aforesaid and to grant plaintiffs a new trial. From the final judgment and the subsequent orders plaintiffs appeal.

We now refer to relevant parts of the 1944 agreement.

Paragraph 2(a) provided that the sellers were to be paid a sum equal to the net worth of Quality as of July 31, 1944, and paragraph 2(b) stipulated that six payments were to be made to sellers equivalent to 50% of the net profits of the business of Quality computed "as herein provided," for the five years commencing August 1, 1944 and ending July 31, 1949. Paragraph 3(b) provided that the amounts payable under paragraph 2(b) should be paid on March 15, 1945 and March 15th of each succeeding year thereafter, final payment to be made March 15, 1950. In paragraph 5 it was stated that the six payments to be made by the buyer as part of the purchase price, in accordance with paragraph 2 (b).

"* * * shall be based upon the net profits of the business of Quality after deducting for Federal income and excess profits taxes applicable to each calendar year and after adjustments for renegotiation. The first payment is to cover the last five months of the year 1944; the next four payments are to cover each of the succeeding calendar years thereafter; and the final and sixth payment is to cover the first seven months of the year 1949."

Paragraph 6 provided that the buyer would employ accountants to audit Quality's books and accounts at least annually, would deliver to sellers a copy of the annual audit by March 15 of each year, and would give them the right to have their own accountants examine the books and records of the buyer and all records of the auditors employed by the buyer.

By paragraph 7 the nine principal plaintiffs, who were the then executive officers of Quality, were retained as its executive officers for the five year period in question.

By paragraph 9 all of the sellers designated plaintiff C. A. Laystrom as their agent for the purpose of receiving payments of the purchase price and "without any limitation, for the purpose of taking any and all other action or steps to be taken by Sellers hereunder."

The evidence shows that plaintiff Hazel Minter, a sister-in-law of C. A. Laystrom, continued as secretary of Quality and thereafter became assistant treasurer of defendant, and throughout the period in question and until 1951 she was in charge of the office, credit and bookkeeping, under the general supervision of plaintiff Leonard S. Laystrom.[1]

Plaintiffs were paid approximately $900,000 on July 31, 1944 for the net worth of the company. Later they received $84,036.66 as full payment, satisfaction and discharge of all claims and

[1.] In May 1946 Quality was dissolved and its business was carried on thereafter by Quality Hardware and Machine Division of defendant which will likewise be referred to as Quality.

demands up to and including December 31, 1945. For the last five months of 1944 and for the calendar years 1945 and 1946, total payments were in excess of $1,000,000. These amounts are not disputed. It is conceded by all parties that there were no net profits in the calendar year 1947.

Plaintiffs claim that the agreement required that "net profits" were to be computed for, and paid in, each accounting period and that the computation of plaintiffs' share of "net profits" for each such period was to be made without regard to losses in other periods.

The question is thus presented as to whether Quality had any net profits in the last year and seven months of the five year period, that is to say, in the calendar year 1948 and the first seven months of the calendar year 1949. The case also presents the issue of whether certain reserves established June 30, 1948 and June 30, 1949 on the books of Quality respecting the so-called "hair dryer" inventory, and reserves established December 31, 1947, December 31, 1948 and June 30, 1949 respecting the Quality receivable account, were correctly established.

Plaintiffs further assert that the agreement created a fiduciary relationship obligating defendant to account to plaintiffs and to deal honestly with them, and that defendant breached its obligations by arbitrarily manipulating the accounts of Quality so as to spread losses over several accounting periods, and thus deprive plaintiffs of their share of net profits. They also contend that certain reports furnished to them were not audits, as required by the agreement.

Plaintiffs agreed that the total sale price of their stock was to be equal to the net worth of Quality at the time of delivery of the stock plus 50% of the net profits of Quality during the last five months of 1944, all of the years 1945, 1946, 1947, 1948, and the first seven months of 1949, the payments to be made on March 15th of each succeeding year. This latter provision geared the amount of a part of the sale price to the fortunes of Quality in its operations during a specified five year period. However, in its essence plaintiffs' contention is that the net profits for the period in question were to be computed and paid on the basis of a computation for each accounting period without reference to losses incurred in prior periods. In effect, for the purpose of computing net profits during the period in question, they would isolate each entire or partial annual period. Thus, as each such period ended on the calendar, their argument is, in effect, the book containing that period's story would be closed and would not be referred to in computing the net profit of succeeding periods. The slate would thus be periodically wiped clean of losses existing at the beginning of each period and its net profits would be computed independently of the results of the period or periods which preceded it. We cannot concur in this contention because it is not supported by a fair construction of the agreement and also because it is not consistent with the interpretation indicated by the acts of the parties in their performance of the agreement. Quality's business was a continuing one and yesterday's results were bound to be recognized. Actually the record shows that losses appearing in 1947 on a hair dryer and on a Quality Appliances receivable account were handled by setting up on the books of account loss reserves for 1947 and succeeding years. These books were kept by or under the supervision of C. A. Laystrom, L. S. Laystrom, Hazel Minter and certain other plaintiffs and it is reasonable to infer that they not only acquiesced in this method of bookkeeping but that they had knowledge of the entry of these reserve items. Moreover various activities of these plaintiffs in relation to both of these matters during the years succeeding 1947 demonstrate that they did not consider that these two subjects were in fact finally disposed of as losses in 1947 or that the story of that year concluded those phases of Quality's business.

We hold that "net profits", as used in the agreement before us, refers to a result obtained by a computation continued through all of the accounting periods from August 1, 1944 to July 31, 1949 inclusive. Thomas v. Columbia Phonograph Co., 144 Wis. 470, 129 N.W. 522, 523. This conclusion is consistent with the findings of fact made by the district court.[2] A summary (which we find to be correct) of the most important of these determinations has been submitted by defendant in its brief. It follows:

"1. The defendant did not stand in a fiduciary relationship to the plaintiffs.

"2. The various audits of the affairs of Quality prepared by Lybrand, Ross Bros. & Montgomery, and furnished by defendant to plaintiffs pursuant to the agreement of July 22, 1944, constituted audits within the meaning of that agreement.

"3. The reserves established on the books of Quality in each of the accounting periods here in issue respecting "hair dryer" inventory and the "Quality Appliances" receivable were properly established in accordance with acceptable accounting practice.

"4. Treating each accounting period of Quality here in issue separately, without regard to profits or losses in other accounting periods, Quality realized no "net profits" in any such accounting period.

"5. Treating the accounting periods of Quality here in issue as a whole, Quality realized no "net profits" in such periods."

The district court heard a large amount of evidence pertaining to the matters involved in these determinations of fact. After examining the record we cannot say that they are clearly erroneous. Under rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C. A., we are not permitted, under these circumstances, to set aside these findings. Central Ry. Signal Co. v. Longden, 7 Cir., 194 F.2d 310, 317; Gaytime Frock Co. v. Liberty Mut. Ins. Co., 7 Cir., 148 F.2d 694, 696; Noble Co. v. C. S. Johnson Co., 7 Cir., 241 F.2d 469, 475.

For the reasons herein set forth, we affirm the judgment and orders from which this appeal was taken.

Affirmed.