George **FUJIMOTO** et al., Plaintiffs-Appellees,

v.

**RIO GRANDE PICKLE COMPANY, Inc.,**
**Defendant-Appellant.**

No. 26553.

United States Court of Appeals
Fifth Circuit.

July 11, 1969.

Benjamin S. Hardy, Thomas G. Sharpe, Jr., Brownsville, Tex., Eugene H. Tepley, Denver, Colo., for appellant.

Asa V. Bland, Atlas, Schwarz, Gurwitz & Bland, McAllen, Tex., for appellees.

Before GOLDBERG and MORGAN, Circuit Judges, and LIEB, District Judge.

GOLDBERG, Circuit Judge:

This appeal involves claims by George Fujimoto and Jose Bravo against the Rio Grande Pickle Company upon written contracts of employment. The questions before us are of contract formation and construction.

Rio Grande Pickle Company, a Colorado corporation engaged in the business of raising and selling cucumbers for the pickling industry, hired Fujimoto in the Spring of 1965 and Bravo in the following Fall. Both of these employees were given important jobs. Fujimoto was employed as the supervisor of the planting and growing operations, while Bravo functioned as the labor recruiter.

In order to encourage them to work with zeal and not to leave the company's employ, Rio Grande offered contracts with profit sharing bonus provisions to both Fujimoto and Bravo. Prior to the offer of the written contracts, the company had responded to the offerees' demands for more compensation by orally agreeing to pay them a salary plus a bonus of ten per cent of the company's annual profits. Bravo told the president of Rio Grande that he wanted the agreement in writing, and the president replied "I will prepare one and send you a

contract in writing." The contractual documents sent to Fujimoto and Bravo did not specify how the offers could be accepted or how the acceptances should be communicated to the company. Under these circumstances Fujimoto and Bravo signed their respective contracts but did not return them to the company. Believing that they had accepted the company's offers and that they were working under the proffered bonus contracts, the two employees remained in the employ of Rio Grande until November 30, 1966.

The written contracts called for the employees to devote their best efforts to Rio Grande and promised in return that the company would pay each offeree a bonus amounting to ten per cent of the company's net profits for each fiscal year. Each employee was to agree to return half of his bonus to the company as an investment in company stock.

Partly as a consequence of projected changes in the nature of the corporation's business, Fujimoto and Bravo quit their jobs with Rio Grande on November 30, 1966. Shortly thereafter the company ceased doing business in Texas. Fujimoto and Bravo then brought this suit, claiming that they had accepted the offered contracts and that they had not received the ten per cent bonuses due them. They alleged that they were each entitled to ten per cent of the company's net profits for the fiscal year ending September 30, 1966, and ten per cent of the profits of the subsequent two months, October and November, 1966.

In answer to special interrogatories the jury found that Fujimoto and Bravo each had entered into a written contract in October, 1965. It was then determined that Fujimoto and Bravo should each recover the sum of $8,964.25 as damages for the company's breach of contract.

On appeal Rio Grande argues that there is insufficient evidence in the record to support the jury's finding that Fujimoto and Bravo had accepted the offered bonus contracts. The company

further argues that even if the contracts had been accepted, the district court's judgment still should be reversed because the court erred in charging the jury as to how to compute the net profits of the corporation.

We have concluded that employment contracts were accepted and that they subsisted throughout the fiscal year ending September 30, 1966, and for two months into the following fiscal year. However, we have also concluded that the district court erred in instructing the jury on how to compute Rio Grande's net profits for the truncated period of October and November, 1966. The judgment of the district court is, therefore, affirmed in part and reversed and remanded in part.

I.

Rio Grande argues that there were no contracts because Fujimoto and Bravo did not accept the written bonus offers by signing and returning the written instruments to the company. Each contract was signed by the respective employee, but neither was returned. Thus the first issue is whether the offers, which by their terms did not specify the means by which they could be accepted, could be accepted by a mode other than the return of the signed instruments.

Professor Corbin has summarized the law on this issue as follows:

"In the first place, there is no question that the offeror can require notice of acceptance in any form that he pleases. He can require that it shall be in any language and transmitted in any manner. He may require notice to be given by a nod of the head, by flags, by wig-wag, by a smoke signal on a high hill. He may require that it be by letter, telegraph or radio, and that there shall be no contract unless and until he is himself made conscious of it.

"Secondly, the offeror can specify a mode of making an acceptance of his offer, without making that method exclusive of all others. If the mode that

he specifies is one that may not bring home to him the knowledge that his offer has been accepted, then such knowledge by him is not a requisite. The offeror can specify a mode of acceptance without any knowledge of the law of contract and without thinking in terms of offer and acceptance at all. This will be considered below.

"Thirdly, if the offeror specifies no mode of acceptance, the law requires no more than that the mode adopted shall be in accord with the usage and custom of men in similar cases. If proof of such usage and custom is wanting or is uncertain, the court must consider probable convenience and results and then help by its decision to establish a custom for the future and a rule of law." Corbin on Contracts § 67, p. 109 [Student Ed. 1952].

See also Allied Steel & Conveyors, Inc. v. Ford Motor Company, 6 Cir. 1960, 277 F.2d 907, 910–911.

■ This case falls within the third of Professor Corbin's rules. Neither written offer specified a particular mode of acceptance, and there is no evidence that Rio Grande ever manifested any intent that the offers could be accepted only by the return of the signed instruments. Moreover, there is substantial and convincing evidence to the contrary. The record is replete with evidence that the company conditioned the bonus offers primarily upon the offerees remaining in the company's employment and that the employees understood that they did not have to return the signed contracts in order to have contracts under which they would each get a ten per cent bonus.

■ Since we have found that the return of the signed documents was not the exclusive means by which the offerees could convey their acceptances, we must now determine whether Fujimoto and Bravo in fact adequately communicated such acceptances to the company. Where, as here, the offer and surrounding circumstances are silent as to permissible modes of acceptance, the law requires only that there be some clear and unmistakable expression of the offeree's intention to accept. In the words of Professor Corbin:

"Whenever the case is such as to require a notice of acceptance, it is not enough for the offeree to express mental assent, or even to do some overt act that is not known to the offeror and is not one that constitutes a customary method of giving notice. *If the overt act is one that clearly expresses an intention* to accept the specific offer and is in fact known by the offeror, there is an effective acceptance. This is because the offeror has actual knowledge." [Emphasis added.] Corbin on Contracts, *supra*, § 67 at p. 111.

■ As Professor Corbin indicates, the mode of expressing assent is inconsequential so long as it effectively makes known to the offeror that his offer has been accepted. One usually thinks of acceptance in terms of oral or written incantations, but in many situations acts or symbols may be equally effective communicative media. See Restatement of Contracts § 21. In the words of Chief Judge Brown in Aetna Casualty & Surety Co. v. Berry, 5 Cir. 1965, 350 F.2d 49, 54:

"That the communication from the Berry Companies to Aetna was not in words express goes only to the weight and clarity of the message, but it does not mean that no contract came into existence. Of necessity, the law has long recognized the efficacy of nonverbal communications. From the formation of contracts by an offeree's silence, nod, hand signal "√" or "x" on an order blank to the doctrine of admission by silence, the law has legally realized that to offer guidance and comment meaningfully on the full range of human conduct, cognizance must be taken of communications other than by words. Symbols for words often suffice. Lawyers and Judges live by them, as the citation to this very case may sometime demonstrate."

See also McCarty v. Langdeau, Tex.Civ. App.1960, 337 S.W.2d 407, 412 (writ ref'd n. r. e.).

■ In the case at bar there is substantial evidence to support the jury's finding that the company knew that the offerees had agreed to the terms of the proffered bonus contracts. Of particular importance is the fact that Fujimoto and Bravo, who had threatened to quit unless their remuneration was substantially increased, continued to work for the company for fourteen months after receiving the offers. Moreover, during this fourteen-month period they did not again express dissatisfaction with their compensation. There is also evidence that Fujimoto and Bravo discussed the bonus contracts with the company president in such circumstances and in such a manner that their assent and acceptance should have been unmistakable to him. In view of these circumstances, Rio Grande could not have been besieged with any Hamlet-like doubts regarding the existence of a contract. Since Rio Grande knew that Fujimoto and Bravo had accepted its offer, there was a valid and binding contract. See Williston on Contracts § 90 (1957).

## II.

■ Rio Grande next argues that even if its offers had been accepted, Fujimoto and Bravo were not entitled to any compensation for the months of October and November, 1966. Rio Grande points out that each contract provided that the ten per cent bonus was to be computed at the end of each fiscal year, and it asserts that this provision means that the employee must work the full fiscal year before being entitled to the bonus. Since Fujimoto and Bravo quit before the fiscal year ended on September 30, 1967, the company argues that these employees were entitled to no bonus for the year. We find this argument to be without merit.

The employment contracts did not in definitive words require that the employees complete the fiscal year before their entitlements matured. The contracts did not even specify that the employees were obligated to remain with the company for a full fiscal year. Under these circumstances we are constrained to apply the Texas rule that "ordinarily an employee entitled to a percent of the profits may on termination of his employment within a compensation period recover his share of the profits earned up to the date of termination." Haggar Company v. Rutkiewicz, Tex.Civ.App.1966, 405 S.W.2d 462, 465 (writ ref'd n. r. e.).

## III.

■ The next and most difficult issue is how the employees' ten per cent bonus should be computed. With respect to this computation, the contracts provide only that the accounting shall be made at the end of each fiscal year. The contracts are silent with respect to the situation where the employee leaves the company's employment before the end of that period. The court's task, therefore, is to construe the contracts to reach the result that the parties must have intended:

"The contract is before us and it is our duty to interpret its meaning without any presumption in favor of the interpretation given it or the legal conclusions reached by the trial court. * * * Its meaning presents a question of law. But in considering the contract, we cannot interpret it, or determine its true meaning in a vacuum with complete disregard of pertinent facts and surrounding circumstances out of which this litigation arose. * * *"

"In reaching our decision in this case we are within the bounds of sound legal principles and fundamental rules of contract construction if we look not only to the actual wording of the contract, but also give consideration to its subject matter, the facts relating to the controversy in issue and the surrounding circumstances, in order to determine the intention of the parties as reflected by the words

654

used." Gulf, C. & F. Ry. Co. v. Coca-Cola Bottling Co., 5 Cir. 1966, 363 F. 2d 465, 467.

See also Hohenstein v. S. M. H. Trading Corp., 5 Cir. 1967, 382 F.2d 530, 531; Lawrence v. United States, 5 Cir. 1967, 378 F.2d 452, 462; Knutson v. Ripson, 1962, 163 Tex. 312, 354 S.W.2d 575, 576. The determination of the parties' intent ceases to be a question of law and becomes a question of fact only where the documentation is ambiguous. Freeman v. Continental Gin Co., 5 Cir. 1967, 381 F.2d 459, 465; Myers v. Gulf Coast Minerals Management Corp., Tex.1962, 361 S.W.2d 193, 196. "[T]he preliminary question whether an ambiguity exists is not a question of fact and is for the court to decide." Freeman v. Continental Gin Co., *supra.*

In the case *sub judice* the district court held as a matter of law that the term "net profits" was ambiguous. He then asked the jury to compute the company's net profits for the months of October and November, 1966. He instructed the jury that since each fiscal year was a separate accounting period, it should calculate the net profits for the year in question without reference to any losses in prior years. More specifically, the court instructed the jury not to consider the fact that the company's books reflected a net operating loss of $156,000.00 for the prior fiscal year in computing the net profits for the October-November period.

 In instructing the jury in this manner the district court erred in two particulars. The court's first error was its conclusion that the term "net profits" was ambiguous. We think that the contract adequately defines the term, although that definition may be difficult of application. "Net profits" is defined in the agreement as meaning the "cash receipts from sales less disbursements, accounts, claims, obligations, and liabilities of whatever kind or nature, and further less the fair value of all personal property acquired by the Corporation prior to this date." On the question of the net profits computation for an

aborted period of less than a year and the treatment to be given to losses carried over from prior years, this definition is not ambiguous—it is silent.

Since the contract is silent rather than ambiguous, this Court must construe the writing to "ascertain the real intention of the parties." Myers v. Gulf Coast Minerals Management Corp., Tex. 1962, 361 S.W.2d 193, 196. In this endeavor "there can be no fixed rule, for every case, in a great measure, depends upon its own facts, the context of the instrument, and circumstances." *Id.* "[C]onsideration may be given to the subject matter of the contract and the surrounding facts and circumstances, not for the purpose of varying or adding to the contract but in order to find out the intention with which words are used." Fenn v. Estate of Burnett, Tex. Civ.App.1966, 405 S.W.2d 161, 164 (no writ). See also City of Pinehurst v. Spooner Addition Water Co., Tex.1968, 432 S.W.2d 515. "However, the courts will not construe a contract to mean that the parties have agreed to act contrary to what common sense and the circumstances obviously demand, unless the contract is explicit and clear in that meaning." Stool v. J. C. Penney Co., 5 Cir. 1968, 404 F.2d 562, 566. See also Connecticut General Life Ins. Co. v. Craton, 5 Cir. 1968, 405 F.2d 41, 47–48; Page v. Superior Stone Products, Inc., Tex.Civ. App.1967, 412 S.W.2d 660, 663 (writ ref'd n. r. e.); Farry v. Landreth, Tex. Civ.App.1966, 404 S.W.2d 620, 622 (writ ref'd n. r. e.).

 Applying the principle that a construction leading to economic distortion is not favored, we have determined that the district court erred in instructing the jury to compute Rio Grande's profits for the fiscal period beginning October 1, 1966, solely on the basis of the company's income and expenses for the October-November period. The court should have instructed the jury to consider the $156,000.00 loss carried over from the prior year in computing the profits for this two-month period.

Rio Grande, which is engaged in the business of growing cucumbers, made a substantial investment in planting and maintaining crops during the fiscal year ending September 30, 1966. Since the crops were not harvested until after the following fiscal year had begun in October, 1966, the company books for the year ending in September reflected the sizable operating loss of $156,000.00. Then during the October-November period the company books showed an exaggerated ratio of income to expenses because the crops planted in the prior fiscal year had been harvested and sold during the period.

The contracting parties were aware of the seasonal nature of the pickling industry with its mountains and valleys of expenses and receipts and with the concomitant ebb and flow of profits. They were also aware that late harvests and/or delayed sales might cause expenses to be concentrated in one fiscal year and profits in another. Considering this experience, it is difficult to believe that the parties would have intended the economic anamorphosis that would result from computing the corporation's net profits solely on the basis of two financially obese months. They must have intended a matching of cash receipts and expenses which would result in the revenue from the sale of crops being offset against the corresponding costs of production for the purpose of determining the corporation's net income. Since in the case *sub judice* the planting and vegetating expenses were incurred in one financially emaciated year and the profits were reaped in the following partial year, this matching can best be accomplished by carrying forward the losses from the lean year into the fat year.

This is precisely what the court did in Thomas v. Columbia Phonograph Co., 1911, 144 Wis. 470, 129 N.W. 522, 523–524, wherein the issue was how to compute an employee's bonus of ten per cent of net profits. In holding that the employee's bonus should be computed by offsetting the profits of the current period against losses in prior periods, the court wrote:

"＊ ＊ ＊ When the words 'net profits' are applied to a course of dealing involving several successive transactions the idea of time is inseparably involved in the expression. For receipts and disbursements, gain and losses, in such case are never simultaneous, and some period is always meant at the end of which net profits may be ascertained. The words 'net profits' unqualified ＊ ＊ ＊ by other words in the contract, would naturally refer to the termination of the adventure. They may also refer to the expiration of a year or other fiscal period, at the end of which profits are to be computed, but which is a fraction of and within the period of adventure. But in this latter case if the business continues and covers several of such fiscal periods, and the period is ＊ ＊ ＊ for the purpose of terminating the adventure, losses and gains arising our of matters covered by an earlier fiscal period but occurring after ascertainment of the profits for that period, are carried into and increase or diminish the net profits in the next or some succeeding fiscal period. ＊ ＊ ＊ It would be an entirely unreasonable construction of this contract to hold that during the period of service the plaintiff might select those months which showed a net profit, compute his percentage on this net profit, and reject all those months which showed a loss. The true construction of this contract is that the fiscal period for computation of net profits is the month, but that the real period to which net profits refers is the period of plaintiff's service and if by reason of net profits made during some months and losses incurred during other months of the period of plaintiff's service, there is at the end no net profit at all, the plaintiff has not earned anything by way of percentages upon net profits. ＊ ＊ ＊"

See also Laystrom v. Continental Copper & Steel Industries, 7 Cir.1957, 244 F.2d 504, 505, aff'g N.D.Ill.1955, 133 F.Supp. 130; Tate v. Lewis, D.Mass.1954, 127 F.Supp. 105; cf. Hamilton Mfg. Co. v. United States, 7 Cir.1957, 214 F.2d 644, 647; Lich v. United States Rubber Co., D.N.J.1941, 39 F.Supp. 675, 681, aff'd 3 Cir. 1941, 123 F.2d 145.

## IV.

■ Rio Grande's final contention is that the district court erred in awarding Fujimoto and Bravo their bonuses entirely in cash. The company contends that this cash award was contrary to the contract provision specifying that the ten per cent bonus should be paid by two checks, each in the amount of five per cent of the net profits, and requiring that one of the checks must be endorsed back to Rio Grande in exchange for stock in the company. In disregarding this stipulation, the district court reasoned that the parties had by their actions modified the means of paying the bonuses. In the prior fiscal year Rio Grande had paid an estimated ten per cent bonus in one check and had not demanded that half of that amount be returned to the company as an investment. By this act Rio Grande showed its decision to modify the payment and reinvestment provisions of the agreement. Fujimoto and Bravo assented to this modification when they accepted and cashed the checks without protest. Rio Grande cannot now renege and reinvoke the dead provisions. In Matanuska Valley Farmers Coop. Ass'n. v. Monaghan, 9 Cir.1951, 188 F.2d 906, 909, 13 Alaska 323, we read:

> "Since the parties to the contract have in fact followed this method of payment from the outset and have made no attempt to conform to the provisions of Paragraph 7, they must be deemed to have modified the written contract by mutual agreement. It is well established that parties to a contract can, by mutual agreement, modify or rescind a contract and adopt in its stead a new agreement. An agreement to change the terms of a contract may be shown by the conduct of the parties, as well as by evidence of an explicit agreement to modify."

See also Hudson v. International Exterminator Corp., Tex.Civ.App.1953, 256 S. W.2d 123 (writ ref'd n. r. e.); cf. Canada v. Allstate Insurance Co., 5 Cir.1969, 411 F.2d 517 [May 19, 1969].

■ Furthermore, the dissolution of Rio Grande energized by its stockholders will make it impossible for Fujimoto and Bravo to tender half of their bonus in exchange for stock. Rio Grande cannot create an impossibility of performance and then use the failure of that performance as grounds for avoiding its other contractual obligations. We cannot tolerate this kind of contractual escapism.

■ The judgment of the district court is correct in all respect but one. The court properly held that the company's offers were accepted and that the contracts subsisted until the end of November, 1966. Contracts do not evanesce because of the perplexities in their construction, and their consequences cannot be ignored because of vexations in damage ascertainment. We hold, however, that the court should have allowed the jury a backward glance at losses carried over on the company's books from prior years. It is from this fiscal vista that the jury should have been instructed to determine Rio Grande's net profits for the October-November, 1966, period. The judgment of the district court is, therefore,

Affirmed in part and reversed and remanded in part.