727 P.2d 18

William R. JONES, Jr.; J. Russell Skelton; and Edward G. Hochuli, Plaintiffs/Appellees,

v.

James A. TEILBORG and Connie Teilborg, individually and as husband and wife; Richard B. Sanders and Ann Sanders, individually and as husband and wife; Frank A. Parks and Ann Parks, individually and as husband and wife; Teilborg, Sanders, Haga & Parks, a professional corporation and/or a partnership, formerly known as Jones, Teilborg, Sanders, Haga & Parks, a professional corporation and/or a partnership; John Does I Through X; Jane Does I Through X, Defendants/Appellants,

TEILBORG, SANDERS, HAGA & PARKS, a professional corporation, Counterclaimant/Appellant,

v.

William R. JONES, Jr.; J. Russell Skelton; Edward G. Hochuli; and Jones, Skelton & Hochuli, a partnership, Counterdefendants/Appellees.

No. 2 CA–CIV 5636.

Court of Appeals of Arizona, Division 2, Department A.

March 15, 1986.

Reconsideration Denied April 15, 1986.

Review Denied Oct. 15, 1986.

Lesher, Clausen & Borodkin by Robert O. Lesher, Tucson, for plaintiffs/appellees, counterdefendants/appellees.

Fennemore, Craig, von Ammon, Udall & Powers by Kenneth J. Sherk, Phoenix, for defendants/appellants, counterclaimant/appellant.

HOWARD, Presiding Judge.

Plaintiffs/appellees were members of Jones, Teilborg, Sanders, Haga & Parks, a professional law firm and corporation located in Phoenix. This case involves their departure from the corporation and the dispute which ensued relative to what monies, if any, appellees were owed. The dispute ended in a trial before the court, sitting without a jury, which awarded Jones $306,-675.71, Skelton $101,649.49 and Hochuli $118,937.80, against the professional corporation and against the defendants, individually and as husband and wife. The defendants/appellants contended that the trial court erred in granting judgment to the plaintiffs on their complaint, in granting judgment against the defendants individually and as husband and wife and in denying the defendants' relief on that part of their counterclaim which alleged a breach of fiduciary duties. We affirm except as to the judgment against the defendants individually and as husband and wife.

The trial court made extensive findings of fact which disclose the following. All of the male individual parties in this case are lawyers duly licensed to practice law in Arizona. On February 1, 1973, the professional corporation of Dunn, Teilborg, Sanders, Haga & Parks was incorporated under the laws of Arizona and bylaws were adopted. The defendant corporation in this action is the same corporation which was originally incorporated in 1973. Except for various amendments changing the name of the professional corporation, the articles of incorporation have remained the same since

February 1, 1973, and the bylaws of the corporation have never been amended or modified.

Jones joined the law firm in February 1974, and on February 1 paid for and was issued 1,000 shares of stock in the corporation. Skelton was employed by the firm as an associate lawyer in May 1979, became a director effective February 1, 1980 and on October 5, 1981, paid for and was issued 100 shares of the corporation's stock. Hochuli joined the firm as an associate in the fall of 1978. In October 1982 the corporation voted to offer Hochuli ownership in the firm effective February 1, 1983. The plaintiff Hochuli, prior to 1983, accepted the offer and status of an owner of stock in the corporation and had been treated as an owner of stock in the corporation prior to February 7, 1983. He had not been issued a stock certificate by February 7, 1983, however, although the basis for determining the price of the shares to be issued to him had been determined.

The corporation was formed and used principally for the lawyer-owners to take advantage of certain tax and retirement benefits not then available except to employees of corporations. At all times during its existence, the corporation held itself out as a professional corporation and all lawyer-owners participated in and benefited from the status and existence of the professional corporation, including the adoption of a corporate pension plan and medical reimbursement plan.

Prior to February 7, 1983, the plaintiffs and the defendants James Teilborg, Richard Sanders and Frank Parks were employed by the corporation as lawyers. The plaintiffs and the said defendants were employed under the terms of an oral agreement for compensation in existence for a period of years prior to February 7, 1983. From the earliest days of the firm, there was an agreement among the lawyer-owners concerning the method of their compensation. It was determined that each lawyer-owner would receive the earnings he produced and would not receive money earned by the other lawyer-owners. The lawyer-owners adopted a definitive compensation system upon which they relied and which formed the total and complete understanding and agreement of the parties. The compensation paid each lawyer-owner was paid through the corporation but was totally dependent in its amount on the productivity of the individual acting as an independent "profit center."

From early on, an understanding existed among the lawyer-owners regarding what would be paid in the event of withdrawal or death. An agreement existed that an owner or his estate would get the salary due, his "time bank" (unbilled work), his receivables, his net from his collections and an allocable portion of the associate profit realized from work that he had produced.

By January 1, 1980, the agreed methods of compensation were established. Each lawyer-owner would receive as wages three elements of income: (1) a monthly amount drawn as basic wages (Tier One Compensation); (2) the difference between the share of the firm's expenses allocated to him by the firm's accounting system and the income produced by his work, minus the amount drawn as basic wages, constituting his net income (Tier Two Compensation); and (3) a share of the profit produced by the work of associate lawyers who are not stockholders, called associate profit (Tier Three Compensation). The lawyer-owners never entered into any agreement among themselves or with the corporation limiting or conditioning the entitlements of the lawyer-owners to income from the three tiers. Profit was never paid on the basis of corporate stock ownership, nor did the lawyer-owners ever enter into an agreement among themselves or with the corporation that entitlements to income in any of the three tiers would be forfeited by voluntary or involuntary departure from employment.

In the beginning, Tier One, the monthly draw, was the only compensation. At all times since the inception of the firm, the lawyer-owners as well as associates were paid regular monthly salaries. In 1976 or 1977, the "net" method of compensation for the lawyer-owners began to evolve. A

formula was determined that produced net income based upon production. Under the "net" concept, the lawyer-owners were paid at the end of each calendar year and during the last month of the corporation's fiscal year, which began on February 1 and ended on January 1. Net income was the production of the lawyer-owner minus his allocated overhead. The "net" of a lawyer-owner was usually paid at the end of the year when cash receipts were in the bank and the expenses actually had been paid; however, from time to time lawyer-owners' nets were borrowed against by the lawyer-owner. No lawyer-owner ever received a "net" payment based upon either accounts receivable or unbilled time. A lawyer-owner was entitled to his "net" when he became self-sufficient as an owner.

Tier Three compensation came into existence when associates were added to the firm. Tier Three income was lawyer-owner compensation as a share of the associate profit pool. The major criterion by which the associate profit pool was divided was production, in other words, who originated the cases and what lawyers or associates produced that profit. This compensation was determined at the end of the fiscal year. The "associate profit pool" available for distribution in January of each year was the aggregate of all of the associates' profit. This pool was diminished by bonuses to the associate lawyers themselves, bonuses to the younger shareholders as well as a certain amount to be retained for February cash needs.

In January of each year, the decision as to what percentage of the associate profit pool would go to which lawyer-owner was made by the board of directors sitting as a board of directors, and based upon actual cash collections less actual expenses during the preceding calendar year. There never was any instance where associate profit was paid to anyone on the basis of either accounts receivable or unbilled time. In the years during which the associate profit was available and divided, Jones never received less than 40 percent of the available associate profit pool and during the years in which he participated in the division of the associate profit, Skelton never received less than 11 percent of the available associate profit pool. Prior to February 7, 1983, Hochuli never participated in the division of associate profit.

The corporation operated on a cash basis and a system of accountability was developed to track the profit of a lawyer-owner. Detailed profit and loss statements were maintained and at any given time during the year a lawyer-owner could precisely determine how much his unit had produced through the lawyer-owner, other lawyers, associates, paralegals or otherwise. Prior to February 7, 1983, the Tier Two and Tier Three income had been paid to the lawyer-owners in January based upon records of income and production of the preceding year. On January 15, 1983, a division of Tier Three income reflecting 1982 production was made in which Jones received not less than 40 percent of the associate profit pool and Skelton received not less than 11 percent of the associate profit pool.

The existence of the Tier Three compensation system influenced the way the firm maintained books of account and financial records. The whole system was geared to account to a particular lawyer-owner at any time as to how much he had produced and how much his unit had produced. The bookkeeping and financial system was geared towards accountability, profit and loss as far as each lawyer-owner was concerned. Detailed records of income were kept and every statement that left the firm was allocated to whomever worked on the file and how much they produced.

Records of interest income were kept and allocated among the lawyer-owners. The profit or loss was accounted for as to each lawyer for each month and a profit and loss statement was maintained for each month. Each month there was a financial statement, a balance sheet which indicated receivables, unbilled time, liabilities and net worth, and computer printouts were maintained which indicated who produced the files, who the responsible lawyer was and

what hours had been billed to that particular case during the month.

From time to time since becoming a lawyer-owner, Jones made various suggestions in writing to the other lawyer-owners proposing a variety of methods of arriving at a fixed system for the distribution of associate profit. In January 1982, the issue of how to apportion associate profit was placed in the hands of a "blue ribbon" committee. None of the methods or formulae suggested by Jones was ever adopted nor did the "blue ribbon" committee ever reach an agreement as to how associate profit would be apportioned among the lawyer-owners.

There never was a specific discussion at which there was an agreement reached with respect to deferred compensation when Jones entered the firm in 1974, when Skelton became an associate and then a director, or when the compensation system was explained to Hochuli in December of 1982. Over the years while he was with the firm, Jones made suggestions, orally and in writing, as to the need for a deferred compensation system. In 1977 Jones issued a memo to the other shareholders asking them, "should we not at this time effectuate appropriate buy/sell agreements to deal with the issue of death, disability or withdrawal by an owner?" Between December 1978 and February 1980, Jones again in writing, advised the other shareholders that he thought it was essential that they work out a position for the firm with respect to voluntary withdrawal, involuntary withdrawal, and the death of an owner.

In 1981 the corporation's board of directors addressed the issue of withdrawal or termination rights and discussed several drafts of written employment contracts containing deferred compensation provisions. An employment agreement came into existence in 1981 or 1982. One form was actually signed by several of the lawyer-owners. However, all of the lawyer-owners could not come to an agreement as to all of the terms of these employment contracts and some of them refused to sign

any such documents. The several employment agreements that were signed by lawyer-owners expired by their own terms in February 1982.

In the summer of 1982 the directors again discussed deferred compensation agreements at various meetings but could not come to an agreement. Jones and Skelton continued to refuse to agree to the terms of any employment contract or deferred compensation provision pending resolution of the compensation matters by the "blue ribbon" committee and the subsequent simultaneous execution by all of the lawyer-owners of employment agreements as well as stock purchase agreements. The "blue ribbon" committee never resolved the issue of deferred compensation.

At the meeting of the directors held on October 19, 1982, the directors voted and decided that compensation would be handled in the same manner as in the past giving consideration primarily to production, firm contributions and ownership.

In November 1982 Jones and Hochuli began having mutual discussions concerning their unhappiness with the firm. On January 15, 1983, the lawyer-owners met to vote on bonuses to be paid to associates and younger shareholders as well as how the remaining associate profit pool would be distributed among the lawyer-owners. At the January 15, 1983, meeting the lawyer-owners, being unable to reach an agreement or consensus as to the distribution of associate profit among themselves, looked to the resulting percentages of associate profit distribution among lawyer-owners in January 1982 for the year 1981. Using such percentages as the starting point, the lawyer-owners each suggested a percentage of associate profit to be awarded to each lawyer-owner and the figures were then put into a calculator resulting in percentages thereafter voted on by the lawyer-owners. This resulted in Jones receiving slightly in excess of 40 percent of the associate profit pool and Skelton receiving slightly over 11 percent of the associate profit pool. Jones and Skelton were paid their salary, their nets and a percentage of

the associate profit for the fiscal year which ended January 31, 1983. Hochuli received his salary and a bonus for the fiscal year which ended January 31, 1983.

On Monday, January 17, 1983, Jones, Skelton, Hochuli and three other members of the firm met to discuss their unhappiness with the law firm. On February 3 or 4, 1983, Jones, Skelton and Hochuli met with one of the associates present at the January 17 meeting to again discuss a list of firm problems and possible solutions. No decision to leave the firm was made. However, setting up a new firm had at least been an alternative that was strongly considered. Prior to Monday, February 7, one of the lawyer-owners, Haga, who was present at the January 17 meeting, advised Skelton that he was not going to leave the firm at that time.

After considering all matters over the weekend, on Monday February 7, 1983, Jones and Skelton decided they were going to practice law·elsewhere. On February 8, 1983, Hochuli advised the defendants of his intention to leave the firm.

By agreement, February 28, 1983, was selected as the cut-off date for billing files on cases taken by plaintiffs to their new firm. The firm billed all such files to the clients through February 28, 1983. During February 1983 while plaintiffs were making arrangements for their new quarters, the firm paid the salaries of the plaintiffs and nine associates who went with them to their new law firm.

Because plaintiffs' new quarters would not be ready until April 1, 1983, plaintiffs and the associates who joined them were permitted to maintain offices in the firm's quarters and it was agreed that the plaintiffs would reimburse the firm for any overhead expenses attributable to plaintiffs until they left for their new quarters.

Article XIII of the bylaws of the corporation is entitled "PURCHASE OR REDEMPTION OF SHARES FROM SHAREHOLDERS; TRANSFER RESTRICTIONS" includes the following provisions:

"SECTION 3. DEATH, INCOMPETENCY OR DISQUALIFICATION. In the event of the death, Mental Incompetency or Disqualification of any shareholder, or the termination of his employment with the corporation, such shareholder or his personal representative shall sell to the corporation, and the corporation shall purchase, all of his Shares for a purchase price which in each instance shall be the Value of the Shares in question as determined under Section 4 ...

\* \* \* \* \* \*

SECTION 4. VALUE. The Value of Shares shall be their allocable book value determined as of the last day (hereinafter called the "Valuation Date") of the month ending on or immediately prior to the event in question (under Section 3 of this Article); provided that—

(a) Except as hereinafter set forth, such book value shall be determined under the direction of the Board of Directors of the corporation as of the Valuation Date in accordance with generally accepted accounting principles and on a basis consistently applied, but nevertheless using the cash method of accounting.

(b) Accounts receivable for professional services rendered, or to be rendered, by the corporation shall be excluded.

(c) Life insurance policies shall be included at their cash surrender value, if any, but proceeds of Life Insurance received or receivable on account of the death of the shareholder mentioned in Section 3 of this Article shall not be included in computing the book value of his Shares.

(d) There shall be subtracted any amount payable, or to become payable, by the corporation to or for the benefit of the shareholder in question or to his personal representative, heirs, successors or assigns, as the case may be, by reason of any written employment agreement between him and the corporation or otherwise payable by the corporation to him or them, or for his or their benefit, as compensation for his services.

(e) No value shall be attributed to goodwill."

The plaintiffs Jones and Skelton claimed that further Tier Two and Tier Three compensation was due and owing to them and the plaintiff Hochuli claimed that there was further Tier Two compensation due and owing to him. They demanded these sums be paid which the corporation refused to do. Instead the corporation tendered to Jones and Skelton the corporation's checks and promissory notes as the first installment payment and evidence of the balance due on the book value of their stock computed as of January 31, 1983. Jones and Skelton refused the tender.

### THE RIGHT TO "DEFERRED COMPENSATION"

Appellants contend the trial court erred in granting appellees a judgment because appellees were not entitled to receive, as deferred compensation, the value of the corporation's accounts receivable and unbilled time contrary to the corporation's by-laws and in the absence of a deferred compensation agreement. We do not agree with appellant's characterization of the issue or with their contention that the trial court erred.

■ We first turn to the by-laws previously set forth. Article XIII, Section 3, provides that in the event a shareholder terminates his employment, the corporation shall buy back his shares. Article XIII, Section 4, provides that the purchase price shall be for book value which is *exclusive* of accounts receivable for professional services. However, Sec. 4(d) provides that there shall be subtracted from any amount payable to the shareholder any sums which have been paid to the shareholder as compensation for his services. The trial court concluded that the sums which it awarded appellees were compensation for services to which appellees were entitled and that such an award was not contrary to the by-laws. In coming to this conclusion the trial court considered the uncontradicted evidence of the compensation system agreed to and adopted by the shareholders.

Under this agreement there was no sharing of income between the shareholders—whatever a shareholder produced was his. The court therefore concluded that Article XIII of the by-laws concerned the method of giving a withdrawing shareholder his part of the assets of the firm and that accounts receivable were not to be included in this calculation because each shareholder had his own accounts receivable. The exclusion of accounts receivable was consistent with their compensation agreement.

Appellants take great solace in what they perceive to be a conflict in the trial court's findings. The trial court found, as a fact, that the shareholders never reached an agreement on a deferred compensation plan, yet, it concluded as a matter of law that appellees were entitled to certain sums representing work which they brought into the firm.

■ We do not believe there is any conflict. While there was never an agreement, in the event of a withdrawal of a shareholder, as to what to do with the income from the cases which were brought into the firm by the withdrawing shareholder, there also was never any agreement that such sums were to be forfeited and given to the remaining shareholders contrary to their oral compensation agreement. Unless a compensation agreement contains a provision for clear and unequivocal forfeiture in the event of voluntary termination of employment by the employee, he forfeits nothing on leaving. *Montgomery Ward & Company v. Reich*, 131 Colo. 407, 282 P.2d 1091 (1955); *Steidtmann v. Koelbel and Company*, 32 Colo.App. 94, 506 P.2d 1247 (1973); *Fujimoto v. Rio Grande Pickle Company*, 414 F.2d 648 (5th Cir.1969); *Lannert v. Greyhound Computer Corporation*, 74 Ill.App.3d 495, 30 Ill.Dec. 415, 393 N.E.2d 70 (1979); *Haggar Company v. Rutkiewicz*, 405 S.W.2d 462 (Tex.App. 1966). The fact that the foregoing cases involved written contracts whereas the agreement sub judice was oral is of no consequence. The same principle applies whether the contract is oral or written.

## THE LIABILITY OF THE INDIVIDUALS

In its conclusions of law the trial court found that since the plaintiffs and the shareholder/owners kept their accounts receivable, unbilled time and their associate profit as personal and individual compensation units, adherence to the corporate form would sanction a fraud, work an injustice upon the appellants and that the individual appellees and their spouses should be held liable in addition to the corporation. This conclusion is clearly wrong.

■ Contrary to the appellants' contention, the doctrine of "piercing the corporate veil" based on alter ego and fraud does not apply to claims asserted by corporate shareholders. This doctrine is only available to third parties who deal with the corporation. See *Crabtree Investments, Inc. v. Aztec Enterprises, Inc.*, 479 F.Supp. 448 (M.D.La.1979); *Energy Reserves Group, Inc. v. Superior Oil Company*, 460 F.Supp. 483 (D.Kan.1978).

■ The statutes governing professional corporations are found in A.R.S. § 10–901, et seq. Section 10–904 makes the law that is applicable to private corporations applicable to professional corporations except insofar as such law may be limited or enlarged by the statutes dealing with professional corporations. Generally, except for the liability for professional malpractice and problems concerning stock ownership the law applicable to private corporations applies to professional corporations. A professional corporation can take advantage of federal tax benefits relative to pension and profit-sharing plans which are accorded to private corporations. In fact, the evidence here shows that the parties and the corporation did take advantage of such benefits. The corporation here had a board of directors, held directors' and shareholders' meetings, issued shares, and held itself out to the public as a corporation. The appellees cannot take advantage of the corporate entity when convenient, and disregard it when inconvenient. Appellees are estopped from denying the existence of the corporation. 18 C.J.S. Corporations

§ 108 (1939 Supp.1985); *Ohaco Sheep Co., Inc. v. Heirs of Mike Ohaco, et al.*, 148 Ariz. 142, 713 P.2d 343 (1986).

■ Appellees cite the case of *Whipple v. Industrial Commission*, 59 Ariz. 1, 121 P.2d 876 (1942) for the principle that the trial court can ignore the corporate existence in order to do "justice." Appellees' reliance on this case is misplaced. In *Whipple* the court stated:

> "It is now well settled as a general rule that when this fiction of the law is urged and carried on for an intent not within the reason and purpose for which it is allowed by the law, the form should be disregarded and the corporation should be considered merely as an individual or an aggregation of persons both in equity and in law." 59 Ariz. at 5, 121 P.2d at 877–78.

In *Whipple*, the evidence disclosed that the corporation was merely a cloak to cover the operations of one Whipple and his partner Brady for the purpose of evading liability on their part under the Compensation Act. In other words, the corporation was being used for a purpose disallowed by the law. That is not the case here and *Whipple* is not on point.

## DAMAGES

■ Appellants contend that the trial court's findings of fact Nos. 54 and 55, which deal with appellees' entitlement to an award of Tier Two and Tier Three income, are clearly erroneous because they constitute combined fact and law conclusions without adequate subordinate findings. We do not agree. Finding No. 54 sets forth the amount that Jones, Skelton and Hochuli had accumulated in Tier Three wages, not yet paid to them, by February 28, 1983. Finding No. 55 shows the entitlements of Jones and Skelton to the Tier Three income and the appropriate deductions to be taken from this income as of February 28, 1983. A trial court which makes a finding of ultimate fact is not required to set forth all underlying and subsidiary and evidentiary facts giving rise

**248**

to the ultimate fact. *Ellingson v. Fuller,* 20 Ariz.App. 456, 513 P.2d 1339 (1973).

### THE COUNTERCLAIM FOR BREACH OF FIDUCIARY DUTIES

Appellants do not contest the trial court's denial of their counterclaim for affirmative recovery from appellees of the bonuses to themselves and for which they voted allegedly without disclosure of their withdrawal plans. Similarly, appellants do not claim on appeal, as they did in the trial court, the cost of hiring and training replacement associates. What they do contend is that the trial court erred in not granting them their relief under the counterclaim for the corporation's interest in the plaintiffs' (claimants) cases taken by appellees and in not ruling that the breach of the fiduciary relationship constituted a complete defense to appellees' claims for any amounts over and above what they had received through February 28, 1983.

Appellants contended that appellees breached their duty in three ways: (1) By knowingly recommending and participating in the decision to award substantial bonuses to withdrawing associates and directors without imparting the information about the pending withdrawal to the remaining directors; (2) by voting to finance these bonuses by having the corporation borrow $50,000, again without disclosure at the January 17 meeting of their impending departure, and (3) by bringing about the mass withdrawal of nine of the corporation's associates. Contrary to these allegations, the trial court found, and the record shows, that no withdrawal was even decided upon until February 17, *after* the January 17 meeting. As for the allegation concerning the withdrawal of nine of the corporation's associates, *the record does not support a conclusion that the appellees were guilty of such conduct.*

The judgment against James A. Teilborg and Connie Teilborg, individually and as husband and wife; Richard B. Sanders and Ann Sanders, individually and as husband and wife and Frank A. Parks and Ann Parks, individually and as husband and wife, is vacated and set aside, and the judgment is affirmed in all other respects.

LACAGNINA and LIVERMORE, JJ., concur.