**Andre BACKAR, Plaintiff-Appellant Cross-Appellee,**

v.

**WESTERN STATES PRODUCING COMPANY (now Hytech Energy Corporation) and Wayman W. Buchanan, Defendants-Appellees Cross-Appellants.**

No. 75–2182.

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1977.

Sherod William Mitchell, pro se.

Ronald T. Knight, U. S. Atty., Charles T. Erion, Asst. U. S. Atty., Macon, Ga., for respondent-appellee.

Before COLEMAN, GODBOLD and TJOFLAT, Circuit Judges.

Edward Kliewer, Jr., Stephen R. Anderton, Dallas, Tex., Ralph G. Langley, San Antonio, Tex., for plaintiff-appellant.

Michael Lowenberg, Dallas, Tex., for defendants-appellees.

Before MORGAN and GEE, Circuit Judges, and HUNTER,* District Judge.

GEE, Circuit Judge:

In this diversity action for breach of a written commission contract, Andre Backar, a citizen of New York, appeals from the final judgment of the district court against Western States Producing Company, a Texas corporation, and Wayman W. Buchanan, the President of Western States, and they cross appeal. Backar is a securities broker from New York. Western States is a Texas oil and gas production corporation engaged in drilling and production, and at the time of the relevant events, Wayman W. Buchanan was its president.

### The Facts

Some years ago Western States was seeking investors for its drilling ventures and approached Backar, enlisting his services as a finder. The parties executed a letter agreement in New York on January 29, 1971, stating:

> In consideration of your [Backar's] obtaining investors (whether persons, corporation, or organizations) for drilling funds managed by Western States Producing Company, or any other companies with which I am associated, each of the undersigned agrees that if any such investors, directly or indirectly obtained by you, ever participates in any drilling venture managed or controlled by Western States Producing Company or Wayman W. Buchanan, you will be paid your customary five percent (5%) commission for such moneys invested.

Buchanan executed the contract both individually and for Western States.

In February of 1971, Backar introduced Buchanan to Martin J. Fribush, the Executive Vice President of Comprehensive Resources Corporation (Comprehensive).[1] After Buchanan and Fribush engaged in an animated discussion about Comprehensive's possible involvement in the financing of drilling operations, Buchanan executed the following memorandum:

> This is to certify that I had lunch today with Andre Backar at the Marco Polo

---

* Senior District Judge for the Western District of Louisiana, sitting by designation.

1. Several related corporations are included in the designation "Comprehensive." In addition to Comprehensive Resources Corp., CRC Corp., Geodynamics Oil & Gas, Inc., and Geo Re-

sources Management Corp. engaged in the drilling ventures with Western States under consideration here. All of the corporations are considered part of Comprehensive for the purposes of this case.

Club. He introduced me to Mr. Martin Fribush of Comprehensive Resources Corporation for the aim of doing business with him.

As per our letter of January 29, 1971, Mr. Backar is entitled to a finder's fee.

Later Comprehensive, acting either for its own account or as a general partner in various limited partnerships, entered into agreements with Western States for fifteen drilling ventures in Texas, New Mexico and Oklahoma.[2] Cash investments made by Comprehensive individually or of funds of limited partnerships in which Comprehensive served as general partner aggregated $6,134,274. Backar recovered a five percent total commission on that amount in the trial court, and from this award Western States and Buchanan appeal. The trial court denied Backar recovery on the proceeds of several notes executed by Comprehensive in favor of Western States, without personal liability but secured by Comprehensive's interest in leases sold it by Western States. The proceeds of these notes amounted to $5,792,884.65. Plaintiff Backar appeals from the trial court's denial of a commission on these note proceeds.

### Backar's Appeal

Understanding Backar's contention requires a grasp of the contractual arrangements in the drilling ventures. Because the fifteen separate drilling ventures engaged in by Comprehensive did not differ significantly, the parties agreed that one of their drilling agreements, "Program No. 30," would serve at trial as an example of how all agreements between Comprehensive and Western States functioned: under Program 30, Western States acquired an oil and gas lease, then sold 59% of it to Comprehensive. Comprehensive then executed a turnkey drilling agreement making Western States the operator of the lease. This agreement afforded Western States a reasonable profit on the drilling of the wells. The total "cost" to Comprehensive of its interest under Program 30 was $743,000. Of this,

$445,000 was represented by cash paid to Western States by Comprehensive. The remaining $298,000 consisted of promissory notes executed by Comprehensive in favor of Western States, without personal liability but appropriately secured by its 59% interest in each lease. For brevity, we refer to these hereafter as nonrecourse notes. Pursuant to the loan, Comprehensive assigned to Western States a quarter of Comprehensive's 59% interest in the production from wells drilled under the agreement. Thus, Western States kept 41% of production from each lease and received an additional 14.75% (25% of 59%) by assignment.

A purpose of the Program 30-type arrangements was to place Comprehensive and its investors in position to take substantial tax deductions without risking more than the amount of cash paid for the leases. Under Program 30 itself, for example, Comprehensive "paid" $743,000 on paper and deducted that amount but turned over only $445,000 in cash to Western States. The other $298,000 was a capital wash: a loan from Western States to Comprehensive, returned by it to Western States to pay for the leases and for drilling. Because the notes were without maker liability, Western States could look only to proceeds of production from the leases for repayment. If the wells were successful, Western States received a substantial bonus because it held 25% of Comprehensive's 59% interest in production. If not, Western States took a bad-debt loss on the notes. Under Program 30 and the rest of the fifteen drilling ventures, Western States loaned out and received back, after production, a total of $5,792,-884.65 in proceeds. Backar argues that this amount is to be viewed as "moneys invested" under the finder's fee contract and that he is therefore entitled to five percent of that amount.

■ Although the trial court found as a "fact" that the nonrecourse notes were not "moneys invested" under the terms of the

---

**2.** In one instance Western States contracted directly with M Press, Inc., rather than Comprehensive, but the parties acknowledge that Comprehensive was responsible for the creation of the contractual relationship.

letter agreement, the interpretation of a contract is usually a question of law. The basic facts underlying this determination are not disputed, only their legal effect, and we therefore review untrammelled by Rule 52(a)'s clearly erroneous standard. *See Murphy v. Travelers Insurance Co.,* 534 F.2d 1155, 1162 n.7 (5th Cir. 1976); *First National Bank v. Insurance Co. of North America,* 495 F.2d 519, 522 (5th Cir. 1974). Even under this more relaxed standard of review, however, we conclude that the trial court correctly denied Backar a finder's fee on the proceeds of the nonrecourse notes.

█ The purpose of the finder's fee contract between Backar and Western States was to locate new capital to support Western States' drilling programs. Western States received no additional capital by the nonrecourse note transactions.[3] With them it paid no pushers and leased no rigs until such time as oil or gas production began, when it began drawing, in its own right, 25% of Comprehensive's production proceeds. For capital acquisition purposes, the transactions incorporating nonrecourse

notes are essentially ones where Comprehensive bought only 44.25% of the lease. The parties to the finder's fee contract clearly contemplated "front money" that Western States could use to finance its drilling programs. The note transactions were meant to confect tax savings for Comprehensive and its investors, not to produce hard cash for drilling operations. Only after Western States had hit did it realize any injection of funds from them. The trial court was not in error when it concluded that the loan proceeds were not the "moneys invested" contemplated by the finder's fee contract.[4]

*The Cross-Appeal*

In their cross-appeal, Western States and Buchanan contest Backar's right to sue for any finder's fee. In a ruling unchallenged here, the trial court held that New York law controls the litigation. *See Backar v. Western States Producing Co.,* 382 F.Supp. 1170, 1173 (W.D.Tex.1974). New York real estate law bars suit by an unlicensed real estate broker to recover commissions on the sale or lease of real estate.[5] Western

---

3. The Internal Revenue Service has ruled that in a similar transaction in which an investor "loaned" an oil and gas limited partnership funds in return for nonrecourse notes and security interests in unproven oil and gas leases the "loan" was not a bona fide debt but a capital investment by the investor in the venture. Rev.Rul. 72–350, 1972–2 C.B. 394. Western States' "loan" to Comprehensive is indistinguishable.

4. Backar attempts to avoid these findings by arguing that Western States made a judicial admission of liability for commissions on the proceeds of the nonrecourse loans. In the context of discussing Comprehensive's investment in Western States' drilling ventures, Wayman W. Buchanan noted that Comprehensive had invested approximately $800,000 directly with Western States. He testified that Western States had paid Backar approximately $40,000 in commissions on those funds and did not contest his right to that amount. Backar notes that approximately $330,000 of the $800,000 investment was composed of proceeds of nonrecourse notes paid by Comprehensive to Western States. Backar argues that this testimony constitutes a judicial admission of liability for commissions on nonrecourse note proceeds.

We have held, on the authority of *Griffin v. Superior Insurance Co.,* 161 Tex. 195, 338 S.W.2d 415 (1960), that to constitute a judicial admission a party's testimony must be "deliberate, clear and unequivocal," *Anderson Brothers Corp. v. O'Meara,* 306 F.2d 672, 676 (5th Cir. 1962), but we do not think Buchanan's testimony rises to that level. It is not clear that Buchanan understood that he was admitting liability for commissions on all proceeds from any transaction incorporating non-recourse notes. He may even have thought that the $800,000 or so invested by Comprehensive was all in cash. Further, Backar argued this precise point to the trial court, which decided that Buchanan's statement was evidentiary only. As we said in *Anderson Brothers,* "The testimony is not conclusive and is only one factor to be considered by the finder of facts." 306 F.2d at 676.

5. No person, copartnership or corporation shall bring or maintain an action in any court of this state for the recovery of compensation for services rendered, in any place in which this article is applicable, in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman on the date when the alleged cause of action arose.
N.Y. Real Prop. Law (McKinney) § 442–d.

States asserts a conflict of laws argument: that because the drilling ventures necessarily involved the sale of oil and gas leases, real property under Texas, Oklahoma and New Mexico law, Backar met the New York definition of a real estate broker.[6] Backar is not licensed as a real estate broker, and thus Western States asserts that § 442–d, quoted at note 5 above, bars Backar's cause of action.

Before examining the merits of Western States' contention, we must determine if this affirmative defense was properly before the trial court when it granted its partial summary judgment against Western States. At no time did Western States formally plead § 442–d as an affirmative defense—a serious omission, since in *Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91 (5th Cir. 1976), we held that an appellant cannot raise an unpleaded affirmative defense in a motion for summary judgment unless the motion for summary judgment is the initial pleading tendered by the party. 530 F.2d at 96.

■ Funding Systems is distinguishable, however, for there the party seeking to assert the affirmative defense on appeal appears to have been the only one aware at trial that the defense was sought to be put at issue. That trial court, in its findings of fact and conclusions of law, made no mention of the defense, and the appellant mentioned it only in his memorandum support-

ing the motion for summary judgment. By contrast, the parties in this case argued § 442–d before the trial court, and the trial court specifically ruled that § 442–d was before it. Moreover, plaintiff stipulated, on April 3, 1974, that the § 442–d defense was properly before the court. This stipulation supplemented a stipulation entered into by the parties on November 24, 1972. In its pretrial order of November 25, 1974, the trial court received the November 24 stipulation into evidence. By doing so, the trial court also received the supplemental stipulation of April 3. In *Funding Systems* we recognized that if an affirmative defense is included in the district court's pretrial order, the defense is not waived. 530 F.2d at 96. By the inclusion of the stipulation in its pretrial order, the trial court validated what it had already recognized: the § 442–d defense was properly before the court.[7] After plaintiff's stipulation that § 442–d was properly before the trial court and the trial court's explicit consideration of § 442–d, plaintiff will not now be heard to contend that the defendant waived the argument. Thus, the § 442–d defense is before us.

■ It does not, however, carry the day. Section 442–d applies only to the sale or lease of real estate. Under Texas, Oklahoma and New Mexico law, oil and gas leases are real property,[8] but under New York law, oil and gas leases are personal proper-

6. N.Y. Real Prop. Law (McKinney) § 440:
   Whenever used in this article, "real estate broker" means any person, firm or corporation, who, for another and for a fee, commission or other valuable consideration, lists for sale, sells, at auction or otherwise, exchanges, buys or rents, or offers or attempts to negotiate a sale, at auction or otherwise, exchange, purchase or rental of an estate or interest in real estate, or collects or offers or attempts to collect rent for the use of real estate, or negotiates, or offers or attempts to negotiate, a loan secured or to be secured by a mortgage or other incumbrance upon or transfer of real estate.  .  .  .

7. The pretrial order that included the stipulation came before the trial of damages, the only issue left after the trial court's grant of partial summary judgment on liability, dismissing the

§ 442–d defense. Arguably the court's inclusion of the § 442–d stipulation in the damages pretrial order was superfluous since the issue had already been disposed of. Nevertheless, the trial court had before it defendant's motion to reconsider its grant of partial summary judgment based, in part, on the § 442–d defense. The pretrial order precludes a finding of waiver of the defense by defendant.

8. *Phillips Petroleum Co. v. Adams,* 513 F.2d 355, 363 (5th Cir. 1975); W. Summers, The Law of Oil and Gas § 165 (1954) (Texas). *Casper v. Neubert,* 489 F.2d 543, 546–47 (10th Cir. 1973); W. Summers, *supra* at § 164 (Oklahoma). *Bolack v. Underwood,* 340 F.2d 816, 820 (10th Cir. 1965); W. Summers, *supra* at § 170 (New Mexico).

ty. N.Y. General Construction Law (McKinney) § 39.[9] Western States asserts that under New York law § 39 applies only to oil and gas leases in New York, and because these leases are located in Texas, Oklahoma and New Mexico, the laws of those states should characterize the property for § 442–d purposes. Western States also points to two New York Surrogate's Court decisions—*In re Piazza's Estate,* 130 N.Y.S.2d 244 (Sur.Ct.1954), and *In re Haldeman's Estate,* 208 Misc. 419, 143 N.Y.S.2d 396 (Sur.Ct.1955)—holding that oil and gas leases on Texas land in a New York intestate's estate were real property for purposes of intestate inheritance. These cases are said to establish that New York looks to the law of the situs of the property to identify the nature of the property for all purposes.

■■■ Not, we think for the purpose relevant here. As the trial court aptly noted, Restatement (Second) of Conflicts provides:

When the same legal term or concept appears in the local law of two states . . . and different meanings are given in these states to the term or concept, the meaning to be applied is that which prevails in the state whose local law governs the issue under the applicable choice of law rule.

Restatement (Second) of Conflicts of Laws § 7, Comment (c) at 18 (1971). Our present task is to determine what constitutes real property for the purpose of applying New York's § 442–d. For this purpose, those wishing to comply with § 442–d will naturally and properly look to New York's characterization of the property they wish to broker. The contrary rule advanced by cross-appellants would produce the not-inconceivable but surely peculiar rule that New York finders could bring businessmen together to deal in leases in some states but not in others, at a time when the location of them might be an unknown matter, reserved for future determination. New York's interest in not penalizing those attempting to comply with § 442–d also distinguishes the Surrogate's Court cases holding that the law of the situs of the property (Texas, Oklahoma and New Mexico, in this case) controls the characterization of the property for other purposes. Of course, we are no more bound by the decisions of these New York trial courts than the New York Court of Appeals would be, *see Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); C. Wright, Handbook of the Law of Federal Courts § 58 (3d ed. 1976); *cf. First National Life Insurance Co. v. Fidelity & Deposit Co. of Maryland,* 525 F.2d 966 (5th Cir. 1976); yet we agree that in questions of intestacy the situs state maintains a strong interest in the inheritance and ownership of oil and gas leases because of the impact on questions of title. But here the question is not how such leases should be characterized for purposes of ownership or devolution but rather how they should be characterized for the purpose of administering New York's real estate licensing law, a matter with which neither Texas, Oklahoma nor New Mexico is likely to have much concern.[10]

---

**9.** Oil wells and all fixtures connected therewith, situate on lands leased for oil purposes and oil interests, and rights held under and by virtue of any lease or contract or other right or license to operate for or produce petroleum oil, shall be deemed personal property for all purposes except taxation.

N.Y. General Construction Law (McKinney) § 39.

**10.** In fact, we note that in at least one Texas case the Galveston Court of Civil Appeals ruled that in a suit involving the precise question here—whether § 442–d barred the plaintiff's action on a brokerage contract entered into in New York concerning Texas land—§ 442–d did not bar the plaintiff's action because under N.

Y. General Construction Law (McKinney) § 39, oil and gas leases were personal property. *Normandie Oil Corp. v. Oil Trading Co., Inc.,* 147 S.W.2d 557, 561 (Tex.Civ.App.—Galveston 1940), *rev'd on other grounds,* 139 Tex. 402, 163 S.W.2d 179 (1942). Although the Texas Supreme Court reversed on the grounds that the plaintiff had no license to do business in Texas and thus could not maintain its suit, 163 S.W.2d at 182, it did not disturb the holding that § 442–d was inapplicable. Certainly we are not controlled by *Normandie,* but its disposition is consistent with our belief that New York law should define what New York intends by the term "real estate" as used in its real-estate licensing law.

We recognized as much when we held in *Richland Development Co. v. Staples,* 295 F.2d 122 (5th Cir. 1961), that the law of the place where the agreement is made governs the validity of a broker's contract under the local statute of frauds. New York's proper interest in licensing of real estate agents suggests a similar result. *See* 15A C.J.S. Conflict of Laws § 19(2)a (1967). *Cf. Irving Trust Co. v. Maryland Casualty Co.,* 83 F.2d 168, 171 (2d Cir.), *cert. denied,* 299 U.S. 571, 57 S.Ct. 34, 81 L.Ed. 421 (1936).

Alternatively, we need not look to the law of conflicts to reach this result: statutory interpretation also negates Western States' argument. We must read New York's real estate licensing law *in pari materia* with § 39. Section 39, enacted in its present form in 1909, is not, by its terms, limited to oil and gas leases on New York land. Thus, we must assume that § 39 reflects the New York Legislature's understanding of what constituted "real estate" when in 1922 it passed the real estate licensing law and that the legislature did not intend for its real estate licensing law to cover the brokering of oil and gas leases. In *Reiter v. Greenberg,* 21 N.Y.2d 388, 288 N.Y.S.2d 57, 235 N.E.2d 118 (1968), the New York Court of Appeals remarked of § 442–d that, "This article is penal in nature and should be strictly construed." 21 N.Y.2d at 391–92, 288 N.Y.S.2d at 61. We would not be true to *Reiter's* requirement if we accepted, in spite of § 39, Western States' attempt to apply § 442–d to these transactions.[11]

In conclusion, § 442–d does not bar Backar's recovery because New York would look to its own definitions of real estate to determine who is a "real estate" broker for purposes of New York licensing statutes. Or, in the alternative, a reading of § 442–d *in pari materia* with § 39 indicates that § 442–d was not intended to cover a finder of purchasers of oil and gas interests. Thus, Western States' § 442–d argument fails.

### Subsidiary Points and Arguments

Western States also challenges three findings of fact that the trial court made in assessing damages: (1) that Backar did obtain investors "for drilling funds managed by Western States" (Finding of Fact No. 1); (2) that "drilling funds" was synonymous with "money" (Finding No. 2); and (3) that Western States "managed and controlled" the fifteen drilling ventures within the meaning of the commission contract (Finding No. 6). We must use different spectacles in examining these findings. Finding No. 1 is, as it is designated, a finding of fact that Backar obtained investors, reversible only if clearly erroneous. Fed.R.Civ.P. 52(a). Finding No. 2, how-

11. Even were we to characterize Texas, Oklahoma and New Mexico oil and gas leases as real estate for § 442–d purposes, it is far from clear that Backar would run afoul of the statute. Backar acted as a finder of investors to bring money to Western States' oil and gas ventures. The ventures included the sale of oil and gas lease interests but only as a part of the overall business package. When real estate is not the dominant feature of the sale of a business, no real estate license is usually required under New York law. *See Myer v. Jova Brick Works, Inc.,* 38 A.D.2d 615, 326 N.Y.S.2d 321, 324 (1971).

Backar also argues that he is a true finder: one who only introduces parties and does not involve himself in negotiations like a broker. He claims that New York courts recognize a distinction between brokers, who are covered under § 442–d, and finders, who are not. Backar is correct that New York courts recognize the difference in the conduct required to earn a fee under a broker's contract as compared to a finder's contract. *See Minichiello v. Royal Business Funds Corp.,* 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793, 796 (1966). Yet that does not decide whether the New York Legislature intended to include "finders" under §§ 440 and 442–d of the New York real property law. At least one New York appellate court has said that it did, *see Sorice v. Dubois,* 25 A.D.2d 521, 267 N.Y.S.2d 227 (1966), and we must agree with a New York trial court that "[i]f the statute does not apply to such a situation, then it is a toothless enactment. . . . In short, every unlicensed broker will be enabled to carry on his business just as he did before the statute came into existence, simply by calling himself a finder, an originator, an introducer, instead of a broker. This would be an absurd limitation of the statute and one unfounded in reason or policy." *Baird v. Krancer,* 138 Misc. 360, 246 N.Y.S. 85, 88 (1930).

ever, poses a problem in contractual interpretation that, as we noted above, involves questions of law unaffected by the clearly erroneous rule. Finding No. 6, with its compound requirement that the trial court determine the extent of Western States' management and control of the drilling ventures and construe whether Western States' involvement met the contractual requirements, presents the sort of mixed question of law and fact usually treated as a question of law, *see, e. g.,* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2589 at 753–54 (1971), but the predominance of factual questions and credibility choices in the finding over the legal aspects indicates application of the clearly erroneous standard of review. *Cf. Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91, 94 (5th Cir. 1976).

■ The evidence clearly supports the trial court's Finding of Fact No. 1 that Backar obtained investors for Western States. After the luncheon meeting between Backar, Buchanan and Martin Fribush, Buchanan executed a memorandum acknowledging that Backar had earned his finder's fee. Further, by paying Backar $40,000 in finder's fees, Western States acknowledged that Backar had obtained investors for Western States. The trial court also correctly concluded that "drilling funds" was synonymous with money. When construing the contract, the trial court places itself in the position of the parties, *see Lawrence v. United States,* 378 F.2d 452, 462 (5th Cir. 1967); *J. M. Huber Corp. v. Denman,* 367 F.2d 104, 109 (5th Cir. 1966), and in this case Western States wanted Backar to find money to drill with and meant that when it wrote "drilling funds."

■ Western States challenges Finding of Fact No. 6 on grounds that Backar's actions did not conform to the contractual requirements giving rise to his fee. Backar certainly obtained investors for Western States, but only when the investors participated in any drilling venture "managed or controlled by Western States Producing Co. or Wayman W. Buchanan" would Backar earn his five percent commission on the

moneys invested. Western States argues that the drilling ventures referred to in the letter agreement were equivalent to drilling mutual funds or some sort of limited partnership arrangement whereby Western States would serve as the general partner and would manage and control the funds of the investors. Western States then argues that because Comprehensive served as the general partner of several limited partnerships in which investors placed their funds and because Western States acted only as an operator of the wells financed by these funds, then Comprehensive managed and controlled the "drilling ventures" and not Western. Although this presents a closer question, the trial court could properly conclude that the drilling arrangements which developed substantially conformed to and fulfilled the parties' intentions expressed in the commission contract.

Initially, the district court could conclude that "drilling ventures" referred to in the commission contract referred not to a limited partnership arrangement or other organizational form of the participants but to the business package that comprised the actual drilling program. From this decision, the district court could follow with the choice that Western States did manage or control the drilling ventures as Buchanan defined management and control:

Q My question was, what are the elements, if you know, of management and control of a drilling venture as referred to herein?

A Well, the main elements are—is the determination, the geological determination of where to drill, the financial arrangements under which the venture will be arranged, when to drill, when not to drill, where to complete, where not to complete.

Q Anything else?

A Basically I believe that's management and control.·

Not only did Western States acquire the leases and put together a drilling package to offer to Comprehensive (acts involving many of the preliminary decisions Buchanan indicated as elements of management

 

and control), but also, as the operator of the drilling contracts, Western States made many of the drilling decisions referred to above as elements of management and control.[12] True, Comprehensive had a veto power by deciding whether or not to accept the proposed drilling package. But once the package was accepted, Western States as operator controlled the drilling, completion and production. Certainly a case exists for another reading of the commission contract—one requiring that Western States manage and control the drilling funds invested in its drilling program. But neither case is so strong that selection of the other becomes clearly erroneous.

Finally, Western States argues that the New York Statute of Frauds, as interpreted in *Intercontinental Planning Ltd. v. Daystrom*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), bars any recovery by Backar. In *Daystrom*, the plaintiff lost an action for a finder's fee for assisting in a corporate acquisition. Daystrom had agreed to pay Intercontinental a commission if Daystrom acquired Rochar, but instead Daystrom was acquired by Schlumberger, who also acquired Rochar. The New York Court of Appeals denied Intercontinental's action for a finder's fee because the actual transaction was not covered by the written finder's fee contract and was consequently barred by the New York Statute of Frauds. In *Daystrom*, however, the contract clearly did not contemplate Daystrom's acquisition by another company, whereas in this case the contract arguably does contemplate the actions taken by the parties. Western States' main objective was to acquire funds to finance its drilling operations. The fact that tax-planning determinations dictated the adoption of some variant or anomalous structures does not negate the fact that Western States acquired the needed funds. The commission contract, though arguably ambiguous, reflects Western States' basic intent to ac-

quire drilling money and thus defeats the Statute of Frauds defense.

AFFIRMED.

---

12. The operating agreement between Western States and Comprehensive for all the drilling programs provides in paragraph 5 that as operator Western States "shall conduct and direct

and have full control of all operations on the Unit Area as permitted and required by, and within the limits of this agreement."