**TRUSTEES OF the CARPENTERS HEALTH AND WELFARE TRUST FUND OF SOUTH FLORIDA, et al., Plaintiffs,**

v.

**UNIVERSAL CONSTRUCTION SERVICES, Defendant.**

**No. 86–0712–CIV.**

United States District Court, S.D. Florida, Miami Division.

Aug. 25, 1988.

George F. Moeller, Miami, Fla., for plaintiffs.

Donald T. Ryce, Coral Gables, Fla., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPELLMAN, District Judge.

### I. INTRODUCTION

This bifurcated civil action was tried on the issue of liability by the Court without a jury on April 4 and 5, 1988. This is an action brought pursuant to a written collective bargaining agreement to which the Plaintiffs, Trustees for various union trust funds, allege that the Defendant Employer became bound as of August 16, 1982 and thereafter as a result of the renewal of that contract, consummated by the signing of the subsequent collective bargaining agreement on April 23, 1985, to all fringe benefits due to the Plaintiffs up to and including September 30, 1986. Based on the trial testimony, the exhibits admitted at trial and the respective credibility of the witnesses as assessed by the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law.

### II. FINDINGS OF FACT *

(1) Plaintiffs have been at all times material to this matter trustees and fiduciar-

---

* The resolution of the most critical issues in this case revolves around the interpretation of several ambiguous provisions of the collective bargaining agreement under which the Plaintiff

ies within the meaning of section 3(21)(A) of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"). 29 U.S.C. section 1002(3) & (37).

(2) The Carpenters Health and Welfare Trust Fund of South Florida, the Carpenters Pension Trust Fund of South Florida, and the South Florida Carpenters Joint Apprenticeship and Training Trust Fund are multiemployer plans and employee benefit plans as defined by ERISA. *Id.* The above mentioned Trust Funds are administered in Dade County, Florida.

(3) Broward Builders Exchange, Inc., and Associated General Contractors of America, Inc., South Florida Chapter (hereinafter referred to collectively as the "Association"), are multiemployer associations serving as the duly-authorized and exclusive bargaining representative of their member employers who have assigned their collective bargaining rights to the Association. Master Carpenter's Agreement (hereinafter referred to as the "MCA"), Preamble & Art. I.

(4) The Association is also the exclusive bargaining representative for those employers who subsequently adopt the MCA by the signing of a Memorandum Agreement attached at the end of the MCA. A memorandum agreement enables a non-Association member employer to join into a collective bargaining agreement negotiated for a trade by the union, on behalf of the majority of the employees in the trade, and the association, on behalf of the majority of employers in the field. The scope of the non-member's delegation of bargaining authority is limited by the terms of the MCA and the Memorandum Agreement. No other basis was asserted suggesting any other theory of delegation.

(5) The Defendant first became involved in contractual relations between itself and the Broward County Carpenters District Council in 1975 and in 1976 became a party employer to the Masters Carpenters Agreement entered into for the period 1976–1979 (stipulation of the parties). The Defendant, though not a member of the association, became legally bound through his signing of the memorandum agreement, which specifically incorporated the MCA in its entirety by reference.

(6) It appears that sometime in the middle of April 1979, the Master Agreement was renewed with a retroactive effective date of April 1, 1979. Sometime in the summer of 1979, the Defendant executed the memorandum agreement constituting page 31 of that agreement (Defendant's Exhibit # 2). The 1979–1982 agreement was to remain in force and effect to March 31, 1982 and thereafter year to year unless written notice was given by either of the parties of signatories of their desire and intent "to reopen any part or all of the agreement." (Defendant's exhibit 2, article 17, page 19).

(7) The Court finds that sometime prior to the expiration of the 1979–1982 agreement, notice was given to reopen that agreement and as a result thereof, sometime shortly after April 1, 1982, a renewal of the agreement occurred with the execution of the MCA of 1982–1985. The MCA was made effective retroactively as of

---

claims the Defendant is obligated to make benefit payments. The threshold question of whether a provision is ambiguous is a question of law. *See Carpenters Amended & Restated Health v. Holleman,* 751 F.2d 763, 767 n. 7 (5th Cir.1985) (citing *Fujimoto v. Rio Grande Pickle Co.,* 414 F.2d 648, 654 (5th Cir.1969)). If an ambiguity can be resolved by reading the contract as a whole, that is without considering matters outside the four corners of the contract, the construction of the ambiguity is regarded as a conclusion of law subject to de novo review upon appeal. When, however, an ambiguity can only be resolved by considering extrinsic or parol evidence, the court's interpretation of the ambiguity is either a matter of fact, or a mixed issue of law and fact. *Id.* at 766–67 & n. 7. The standard of review in such cases is unclear. If the factual matters involved in the inquiry require the court to resolve disputed issues of fact before determining the legal effect, the more appropriate standard of review may be the clearly erroneous standard. *Id.* at 767 n. 7 (citing *Backar v. Western States Producing Co.,* 547 F.2d 876, 884 (5th Cir.1977)). Several of the following findings of fact actually present mixed issues of fact and law pertaining to the interpretation of ambiguous contractual provisions and requiring the resolution of disputed factual matters. Accordingly, they are included in this section of the Court's opinion.

April 1, 1982 (Defendant's Exhibit 3; Plaintiff's Exhibit 1).

(8) On August 17, 1982, the Defendant executed the memorandum agreement constituting page 27 of the MCA of 1982–1985 (Defendant's Exhibit 3; Plaintiff's Exhibit 1). To the extent clearly provided in the MCA and the Memorandum Agreement, the Defendant, thereby consented to the Association's serving as its bargaining agent and agreed to be bound by the terms resulting from negotiations between the Union and the Association, irrespective of its right to have its own bargaining representative attend the negotiations. The Defendant made no attempt to obtain independent representation, appeared to be uninterested in the negotiation process, and at no time gave any indication whatsoever that it was dissatisfied with the process.

(9) The Memorandum Agreement executed by the Defendant provides (page 27, Exhibit 3; Plaintiff's Exhibit 1):

It is agreed between the undersigned, hereinafter called "employer", and BROWARD COUNTY CARPENTERS' DISTRICT COUNCIL, and the CARPENTERS' DISTRICT COUNCIL OF MIAMI, FLORIDA and VICINITY, hereinafter called the "Unions", in consideration of services performed and to be performed by Employees working within the trade and territorial jurisdiction of the Unions, as follows:

1. The Employer agrees to comply with all terms, including wages, fringes, hours, and working conditions as set forth in the Agreement between the Unions and BROWARD BUILDERS EXCHANGE, INC., and THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., SOUTH FLORIDA CHAPTER, referred as the Master Carpenters Agreement and any and all Appendixes attached thereto which became effective on April 1, 1982, and any amendments, modifications, extensions and renewal negotiated by the signatory parties thereto. The Master Carpenters Agreement is specifically incorporated herein by this reference and made a part of this Memorandum Agreement. The Employer acknowledges receipt of a copy of said Master Carpenters Agreement. The Employer acknowledges receipt of a copy of said Master Carpenters Agreement and all Appendices attached there to, and that he has read and understands the same.

2. The Unions agree to abide by all the terms of the Master Carpenters Agreement and all Appendices attached thereto and any amendments, modifications, extensions and renewal negotiated by the signatory parties thereto.

3. This Memorandum Agreement shall remain in full force and effect for the term of the Master Carpenters Agreement and it Appendices. The Unions agree to send to the Employer a copy of any written notice to the Contractor Associations signatory to the Master Carpenters Agreement and its Appendices in the event any renewal or modification of termination of said Agreement is desired prior to the expiration thereof. The Employer agrees to be bound by any renewal or modification or termination of the Master Carpenter Agreement and its Appendices negotiated by the signatory Contractor Associations and the Unions, unless an appropriate written notice is sent to the Unions and the Associations at least sixty days prior to March 31, 1985.

(10) The critical provision of the Master Carpenters Agreement which must be read together with the Memorandum Agreement in order to resolve this dispute is Article XVII entitled "RE–OPENING—TERMINATIONS AND RENEGOTIATIONS", (page 18, Plaintiff's Exhibit 1) which provides:

This Agreement shall be in force and effect to and including Midnight, March 31, 1985, and thereafter from year to year unless the parties to this Agreement serve written notice within the time limits fixed by law citing their desire and intent to reopen any part or all of this Agreement. If such notice is given, then for sixty (60) days prior to this expiration date, the parties will make an honest effort to renew this Agreement and fix mutually satisfactory wage rates, work-

ing conditions and other provisions for the next ensuing Agreement following March 31, 1985.

In order to facilitate negotiations and prevent termination of benefits hereunder the parties are empowered to extend the terms of this Agreement beyond March 31, 1985, for short terms not to exceed thirty (30) days each term, provided that notice of such temporary extensions of this Agreement are mailed to each Employer who signs this Agreement. In the event an extension or extensions are made as set forth herein, all parties and signatories to this Agreement shall be bound by such temporary extension for the length of time set forth therein.

(11) The Court also finds that the quoted portions of the MCA and the Memorandum agreement are identical to the language contained in the MCA and Memorandum Agreement of 1979–1982, respectively (Defendant's Exhibit 2).

(12) The evidence unequivocally shows that the Defendant Employer did not give any "appropriate written notice" at any time prior to March 31, 1985, in accordance with paragraph 3 of the aforesaid memorandum agreement. The Court further finds that on or about January 24, 1985 and at least 60 days prior to the March 31 expiration date of the MCA of 1982–1985, the Union gave written notice indicating its "desire to reopen negotiations for the purpose of modifying the agreement effective April 1, 1985." (Defendant's Exhibit 4, Plaintiff's Exhibits 7, 8, and 9, at page 21).

(13) The evidence further shows that on or around January 24, the Union forwarded copies of its notice to reopen together with a letter of enclosure to all party Employers, whether by way of Association membership or by the execution of the Memorandum Agreement, who had not given timely notice under paragraph 3 of the Memorandum Agreement (Plaintiff's Exhibit 9, Composite Exhibit). The Defendant contends that it did not receive the first page of Plaintiff's exhibit 9 but only the second page (Defendants Exhibit 4) and construed that to be a notice directed to the Defendant individually reopening negotiations pertaining to the MCA of 1982–1985, and effectively terminating the agreement and relieving the Defendant of its obligation to give notice of intent to terminate pursuant to paragraph 3 of the Memorandum Agreement.

(14) Having had the opportunity to view the President and sole owner of the Defendant, Michael Wejta, over the course of his lengthy testimony, the Court finds him not to be a credible witness. His testimony was highly self-serving, frequently self-contradictory, and equivocal. He acknowledged signing the Memorandum Agreement, which in plain terms incorporates the MCA by reference and asserts that the signatory parties have read and fully understood the MCA, and which was attached as the last page of the MCA. He claims, however, that he did so without reading the MCA or even its cover page. He further contends that somehow, he was bound only by the Memorandum Agreement and not by the MCA. On the basis of his testimony, he is in no position to claim that he believed his obligation ceased under his construction of Article XVII of the MCA.[1] He is estopped from claiming that he relied on any construction of the language of the MCA, after having claimed not to have read it. The Court rejects Wejta's testimony that he relied on the copy of the Notice to Reopen in failing to send timely Notice of Termination.

(15) Moreover, as the Court will explore further in its conclusions of law, there is no reasonable construction of the MCA or of the Memorandum Agreement that supports the contention that a Notice to Reopen relieved an Employer of all obligations under the MCA and effected a termination of the contract. Even if the Defendant actually believed the Notice to Reopen was directed to it, it had an obligation under Article XVII of the MCA to make an "hon-

---

1. If ignorance of the terms of a contract is no defense, one might reasonably conclude that self-serving, selective ignorance, even if credible, is less of a defense. *See, e.g., Sabin v. Lowe's of Florida,* 404 So.2d 772 (Fla. 5th DCA 1981).

est effort" to negotiate with the Union for a renewal of the MCA for at least 60 days prior to March 31, 1985. Thus, by January 31, under the Defendant's strained interpretation of the copy of the Notice to Reopen, it either had to send timely notice of termination, or commence its own good faith negotiations with the Union. It did neither. Nor did it contact the Union in an attempt to do so.

(16) The overall behavior of Wejta towards the Union over the course of their relationship demonstrates an egregious pattern of reckless disregard and gross delinquency. He consistently sought the benefits of hiring Union employees, while refusing to comply with the concomitant burdens until being forced to do so by the Union. The Court finds that his failure to give timely notice of termination was a result of his character and habits; it had nothing to do with any of the Union's conduct or documents. This is further evidenced by the fact that on the previous occasions on which Wejta testified that the Union "forced him to sign" renewed MCA's, he had never sent a timely Notice of Termination although he clearly would have preferred avoiding his obligations to the Union while employing its members. To the extent that Wejta did not want to forego the right to employ Union members at least until March 31 and, more likely than not, into the month of April, he did not intend to terminate his participation in the agreement, despite his distaste for his obligations thereunder and his repeated delinquency in compliance therewith.

(17) Moreover, Wejta's testimony that he only received the second page is directly contrary to the testimony of Plaintiffs' witness, Robert Stephenson, who was the Union's local secretary and treasurer from 1982 to 1987. He testified that he was the sole person who mailed out the copies of the Notice of Reopening to all Employers who had not filed a timely 60 day notice of termination by the time of the mailing, to wit, on or about January 24, 1985. Stephenson further testified that he personally verified that each envelope that went out contained both documents. Although there is a realistic likelihood of error in repeating this process as he did over 300 times, the Court finds the witness to have been extremely credible and credits his testimony. The Defendant stipulated that it had received a letter that the Court finds to be a copy of the Notice of Reopening sent to the Association. Based solely on Wejta's testimony, however, Defendant claims to have received only the copy of the notice and not the cover letter that expressly indicated that the second sheet was a copy sent to non-terminating Employers. Because of the huge gap in credibility between Wejta and Stephenson, the Court expressly rejects Wejta's testimony despite the likelihood of error, and finds that both pages were in fact sent and received by Wejta.[2] Thus, the Defendant was on notice of the Union's intent to renew and modify the MCA early enough to send a timely notice of termination pursuant to the Memorandum Agreement.

(18) Significantly, even if the Court accepted Wejta's contention that he received a copy only of the Notice to Reopen, a reading of the copy (Defendant's Exhibit 4, Plaintiff's 7, 8, and 9 [second page]) indisputably reflects that the same constituted the "written notice" contemplated to be given to the Association, pursuant to Article XVII of said agreement, and paragraph 3 of the Memorandum Agreement which provides that a "copy" of the Notice be sent to each individual employer. Wejta either knew or should have known that he

---

**2.** Whether he read them or even opened the envelope is another matter entirely. In any case, the letter, which bore the salutation "Gentlemen," and no named addressee, clearly was directed to the multiemployer Associations and not to individual Employers. In the letter, the Union referred to the addressee as "your Associations," and states that its representatives would "meet with you and other Associations named in our Contract." Wejta acknowledged that he was not an "Association." Moreover, in the bottom left hand corner of the letter was a typed notation stating, "Copy of letter sent to: Associated Gen. Contractors[,] Broward Bldrs. Exchange[,] Lathers Association." Not only did Wejta have no reason to believe that the Union sought direct negotiations with his company, he must be held to have known that the Union did not seek to do so by virtue of the copy of the January 24 letter.

was only entitled to a *copy* of the Notice sent to the Association and that, in the absence of any indication by him to the Union of his intent to terminate their relationship (such as a timely Notice of Termination, for example), the Union would have no reason to seek separate negotiations with Wejta regarding the Defendant. Thus, under the circumstances, the copy could not reasonably have been interpreted or construed to have constituted notice by the Union directly to an Employer who was a party to said agreement by virtue of execution of the Memorandum Agreement. It is undisputed that the Defendant was bound by the terms of the Memorandum Agreement and, therefore, it was bound under the MCA, which was explicitly incorporated by reference within the Memorandum Agreement.

(19) By its terms, the Memorandum Agreement had the same term as the MCA—that is, until March 31, 1985, unless it were extended or renewed. It further bound the Defendant to "any renewal or modification or termination" of the MCA because a copy of the Union's written Notice to Reopen was sent to Defendant prior to March 31, 1985, as required by paragraph 3 of the Memorandum Agreement, and because Defendant failed to opt out of being so bound by sending notice at least 60 days prior to March 31, 1985—the only available means under the Memorandum Agreement by which the Defendant could opt out. Thus, subject to the term of the MCA, the Defendant was bound by *any* renewal, modification, or termination of the MCA. It had made the Association its exclusive bargaining representative for the life of the MCA, unless it sent timely Notice of Termination, which it did not do.

(20) No party took any action to bring about the termination of the MCA. In fact, when the Union proposed the newly negotiated MCA for membership approval near the end of March, it was rejected and a Union strike resulted. Nevertheless, the signatory parties continued to negotiate in the face of this last minute impasse and ultimately agreed upon a renewal of the prior MCA that was finally executed on April 23, 1985. Thus, the Association and the Union had agreed to extend the MCA into the month of April as they had done on at least two occasions in the past.

(21) The Union mailed notice of its intent to extend the earlier MCA on April 3, 1985 (Defendant's Exhibit 5). It was in the form of an offer to extend the MCA and provided a signature line for the Defendant to sign as indicating his acceptance of the extension. The Defendant, as was his practice, failed to comply with its duty to sign the form.

(22) As was required by the MCA, the Union mailed notice of extension to the Defendant. Although it was mailed after April 1, it was mailed at a reasonable time in light of the exigent circumstances involved, to the hundreds of employers who had not sent timely notice of intent to terminate.

(23) Stephenson, who testified that he was on the negotiating team responsible for the drafting of the earlier MCA stated that the purpose of giving notice of extension to individual employers was to allow them to have their own representative attend the negotiations, although the employers would ultimately be bound by whatever the Union and Association ultimately agreed upon.

(24) The Defendant never participated or sought individual representation at the 1985 or any previous negotiation process.

(25) The Court finds that the execution of the MCA of 1985–1988 on April 23, 1985 effected a renewal of the 1982–1985 MCA in that the overall language of the second agreement was nearly identical to that of its predecessor.

(26) On April 23, 1985, the Master agreement of 1982–1985 was retroactively renewed as of April 1, 1985, in all respects except as to wages, originally for the period of 1985–1988. The agreement as to wages was only to be effective prospectively from the actual date of the execution of the agreement: April 23, 1985 (Master Carpenters Agreement 1985–1988, Appendix B,

paragraph II).[3] The effective date for the payment of benefits (health and welfare, pension, check off, apprentice and training and industry advancement fund) was April 1, 1985 (Article XI, MCA of 1985–1988, as executed on April 23, 1985).

(27) Subsequent to March 31, the Defendant continued to make required payments for benefits, as required by the MCA of 1982–1985. Although Wejta claimed that this was a mistake that was halted as soon as he learned of it, the Court does not credit his testimony in this matter. Wejta simply did not care whether or not he was obligated to make payments. As was his longstanding uncooperative practice, he made them only when the Union had something to hold over his head. As of March 31, Wejta still intended to employ Union members, and therefore, believed that he was still obligated to make payments subsequent to March 31, as he had had to do on previous occasions. Thus, even assuming that the Defendant had a choice in the matter, he intended to continue his contractual relationship in order to be able to employ Union members and therefore, by extension, he intended to enter, and in fact did enter, any contract necessary to permit him to employ the members.

(28) The Court notes that subsequently, on August 9, 1985, an amendment was added to the agreement changing the date of termination of contractual benefits to September 30, 1986. This date is the last date for which the Plaintiff Trust Funds claims benefits arising under this Agreement.

## III. CONCLUSIONS OF LAW

Jurisdiction is conferred upon this Court pursuant to sections 502 and 515 of ERISA. Title 29, U.S.C. sections 1132 and 1145. In finding that it has jurisdiction over both the parties and the subject matter, the Court specifically finds that no part of the subject matter of this suit falls within the purview of the National Labor Relations Act.

The MCA was a collective bargaining agreement negotiated by the Union, the exclusive bargaining representative of a majority of the employees in the trade, and the Association, the exclusive bargaining representative for a majority of employers in the field. An agreement can only be "collective" to the extent that it is negotiated subsequent to this type of delegation. Thus, one of the premises of the MCA was that any employer, whether or not an Association member, who joined in the agreement, necessarily agreed or acquiesced to the Association's serving as its exclusive bargaining representative. *Se Ted Hicks & Associates, Inc. v. NLRB*, 572 F.2d 1024 (5th Cir.1979); *Electrical Workers Local 257 v. Grimm*, 786 F.2d 342 (8th Cir.1986). This delegation, however, is limited by the scope of the instrument purporting to delegate such authority. *Id.*

■ The Memorandum Agreement provides certain terms and conditions pertaining to both the Union and the Defendant. The net effect of the agreement, however, is that if its terms were complied with, the delegation of authority would be effective for the life of the MCA, even if the life were extended indefinitely by the process of renewal and extensions, unless and until the Defendant gave Notice of Termination at least 60 days prior to March 31 of any year beginning in 1985. Therefore, as long as the MCA did not terminate, the Defendant is bound under its subsequent renewal up to and including September of 1986. *See Ted Hicks*, 572 F.2d 1024; *Oil Workers Int'l Union Local No. 463 v. Texoma Natural Gas Co.*, 146 F.2d 62 (5th Cir., 1944), *cert. denied*, 324 U.S. 872, 65 S.Ct. 1017, 89 L.Ed. 1426; *Carpenters Amended & Restated Health v. Holleman*, 751 F.2d 763 (5th Cir.1986); *Central States Pension Fund v. Hitchings Trucking*, 472 F.Supp. 1243 (E.D.Mich.1979).

■ Because no party, including the Defendant, even attempted to terminate the MCA, the critical inquiry is whether the

**3.** Ordinarily, as in the MCA of 1982–1985, Art. XVI, wage changes would also be effective retroactively from April 1. Because the new MCA lowered the wages, however, it was agreed that retroactive deductions would not be made.

MCA somehow terminated *by its own terms,* thereby divesting the Association of its authority to obligate the Defendant to further collective bargaining agreements prior to the execution of the subsequent MCA. By its terms, the MCA would not lapse, but would automatically be renewed for one-year periods if no party took action to the contrary at least 60 days prior to March 31. The Memorandum Agreement's life was tied to that of the MCA. Thus, if the parties took no action, and if the Defendant did not send 60–day Notice of Termination, the Memorandum Agreement's term would automatically be extended for a year, as long as Notice of Renewal were sent to the Defendant prior to March 31, 1985. Once there were fewer than 60 days remaining prior to March 31, the matter was out of the Defendant's hands. He was merely a passive party awaiting news of the Association's and the Union's decisions and actions. *See, e.g., Central States Pension Fund v. Hitchings Trucking,* 472 F.Supp. 1243 (E.D.Mich.1979).

As to extensions of the MCA's term, Article XVII clearly states that the purpose of extensions is to prevent termination of the MCA in the event that negotiations have been reopened but not concluded as of March 31, 1985. In effect, the MCA dictates a contractual canon of construction that is in keeping with a strong statutory and common law policy favoring enforcement of collective bargaining agreements and of contracts in general. *See, e.g., H.K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); *cf. Consul Ltd. v. Solide Enterprises, Inc.,* 802 F.2d 1143 (9th Cir.1986). Article XVII further provides that if Notice of Reopening is made, the parties are obligated to make a good faith effort to renew the agreement upon mutually satisfactory terms. The intent of the MCA is to avoid termination if at all possible. Accordingly, any ambiguous terms of the MCA are to be construed in light of and in the furtherance of the MCA's stated purpose.

One reasonable reading of Article XVII suggests that bilateral consent is not required for an extension. It provides that "the parties are empowered to extend." It does not require that both parties consent. To read this sentence as requiring bilateral consent would render it superfluous—i.e., the MCA can be extended if the parties agree to extend it. Reading the provision in light of the overall purpose of the extension provision and the parties obligation to make an "honest effort" to overcome impasses and to prevent termination, it would appear that each party is empowered to extend the MCA for up to thirty days at a time *unilaterally.*

In any case, the Defendant was not a signatory to the original MCA and therefore, the Defendant's consent to the extension was not necessary. Pursuant to paragraph 1 of the Memorandum Agreement, the Defendant agreed to comply with all "modifications, extensions, and renewals negotiated by the signatory parties." Defendant's failure to comply with the Union's request that the Defendant sign an approval form as to the extension of the MCA was of no legal consequence.

Moreover, although Article XVII requires notice of such extensions to be mailed to each Employer, it is silent as to the timing of the notice. In this respect, the contract is ambiguous. It is stipulated that notice of the extension was mailed to the Defendant on April 3, 1988. Thus, if the Defendant could only be bound by an extension if notice were mailed prior to March 31, the MCA would have terminated with respect to the Defendant on March 31. Such a construction, however, is inconsistent with a reading of the whole contract, the intent of the parties, the parties' course of conduct, and frustrates the purpose of the extension provision by rendering technical compliance with such a provision impracticable in the event that a clearly forseeable impasse or strike occurs on or soon before the cut-off date, a likely event in the collective bargaining process. This is precisely what occurred in 1985 and in previous renewal years when the Defendant was employing Union members as a party to the previous MCA's. The Defendant had every reason to know that this was the practice regarding extensions, with which he had agreed to comply. He cannot now,

by hindsight, scrutinize the events that occurred in the renewal process under a microscope to discover instances of technical non-compliance to absolve himself of his contractual obligations when he could have and should have done so simply by sending timely notice.

First, in the Memorandum Agreement, the Defendant agreed to comply with any modifications of the MCA. Thus, even if the MCA did provide that Notice of Extension had to be mailed prior to March 31, the signatory parties had the power to modify this provision to allow for the mailing of notice for a reasonable time after March 31.

Second, the extension provision is directed primarily, if not uniquely, to the situation in which reopened negotiations come to an impasse near the March 31 deadline. It would be contrary to the general intent of the MCA and patently unreasonable to require the Union to conduct a mass mailing to all non-signatory employers as a condition precedent to obtaining an extension, should the impasse occur unexpectedly with little or no time to spare before the MCA terminates. This is exactly what happened in this case, as Mr. Stephenson testified, when a strike erupted after the Union's membership failed to approve the new MCA by the end of March.

Third, the purpose of the notice requirement as to extensions is not to enable an employer who has signed the Memorandum Agreement a second chance to break free from the MCA after failing to give 60 day Notice of Termination. Even if it were, the Union could circumvent this effect by Extending the MCA as a matter of course towards the end of March. Thus, the timing of the notice is not a material condition.

As Stephenson, who was personally involved in the MCA renewal negotiations testified, the purpose of the notice requirement, other than any informational or courtesy function it may have served, was to enable any employer who took advantage of his right to seek independent representation at the negotiations to continue to do so for the duration of the extension period. This concern, however, is inapplicable to the Defendant, which showed no interest whatsoever in the negotiation process or in the Defendant's overall relationship with the Union. There was no evidence offered to refute Stephenson's testimony. Wejta did not contradict Stephenson's asserted purpose, although he disingenuously attempts to use it as a means of avoiding his Union obligations. This is exactly the sort of result that Article XVII, by its language, seeks to avoid.

The Court is loathe to construe the MCA as requiring Notice to Memorandum Agreement Employers be sent prior to March 31, 1988, as a condition precedent to the Defendant's duty to comply with and to recognize the extension of the MCA pursuant to Art. XVII. *See, e.g., Christofferson v. Halliburton Co.,* 617 F.2d 403 (5th Cir. 1980); *Howard v. Federal Crop Insurance Corp.,* 540 F.2d 695 (4th Cir.1976). If the parties had intended post-March 31 notice to have the effect of dissolving these Employers' relationships with the Union, the MCA would have so provided or would have provided for some time frame for the mailing of the notice. The MCA and the Memorandum Agreement give a time frame for the Union and the Association to notify the Defendant of any intent to renew, modify, or terminate the MCA. Likewise, the Memorandum Agreement allows the Defendant to terminate only upon timely notice—i.e., at least 60 days prior to March 31. It also bound the Defendant to all "amendments, modifications, extensions, and renewals" negotiated by the MCA signatory parties (at paragraph 1), but only obligated the Union to send pre-March 31 notice to the Defendant regarding intent to effect a "renewal or modification or termination" of the MCA (at paragraph 3). Pre–March 3 notice was required for just about everything *except* extension.

The only mention of extension in this agreement is the Defendant's unconditional promise to comply therewith. When time was of the essence, the agreements indicated as much. By implication, the parties did not view time as being of the essence in regards to notifying individual employers of the extension of the MCA. Therefore,

the Union was obligated to mail notice to the Defendant within a reasonable time of its decision as to the need for an extension. *See A.M.R. Enterprises, Inc. v. United Postal Savings Ass'n,* 567 F.2d 1277 (5th Cir.1978); *Gentry v. Smith,* 487 F.2d 571 (5th Cir.1973). Under the circumstance, three days after March 31 was clearly reasonable.

As Mr. Stephenson testified, the timing of the renewal process in 1985 was nearly identical to the timing during the renewal processes as they occurred on the two previous occasions in which the Defendant was involved. This is the sole testimony or evidence of the parties' course of conduct and the Court finds it relevant in determining that time was not of the essence in the mailing of a Notice of Extension to individual Employers.

■ Moreover, the Defendant never complained in previous renewal situations because he needed to retain the benefits of Union hiring. When approached by Union representatives, the Defendant had to choose either to agree to be bound to the extensions and renewals effected, or to discontinue employing Union members. In fact, Wejta made benefit contributions and deducted Union check-off amounts as required by the MCA subsequent to March 31, 1985. Thus, Wejta's conduct immediately after 1985 belies his intent to continue to hire Union employees, and by extension, to be bound by the renewed MCA as negotiated by the Union and its longstanding bargaining representative, the Union, so that he would be entitled to continue employing Union members. *See NLRB v. Haberman Construction Co.,* 641 F.2d 351, 356 (5th Cir.1981) (*en banc*). The Defendant may not attempt to seek the "best of two worlds" by attempting to assert that his obligations have terminated while continuing to reap the benefits of hiring and employing Union members, and continuing to conduct itself as though it were bound under the agreement. Thus, his post-March 31 conduct under these facts demonstrates the Defendant's subjective belief that he was, and, as of some date subsequent to March 31, still intended

to be, bound under the MCA and that the Defendant never intended to discontinue his relationship with the Union until some time in April, if ever. Therefore, the Defendant is estopped from asserting this untimely objection to the extension and renewal of the MCA. *See also NLRB v. Hartman,* 774 F.2d 1376, 1383–85 (9th Cir. 1985).

In 1985, however, because the renewed MCA provided for a decrease in wage rates, Wejta testified that he offered his employees to stay on with him as non-Union employees without a reduction in wages or benefits. It was only after the negotiations terminated in April, however, that Wejta could have learned of the wage reduction and could have devised a scheme whereby he could retain his workers without incurring any obligation to the Union. Wejta may not be heard to complain about the April 3 mailing of the Notice of Extension for this questionable purpose and practice. If the post-March 31 notice had prejudiced him in any way, Wejta would have complained at the time. He offered no evidence as to his dissatisfaction at that time.

Rather, he sat out the negotiations without giving the Union any notice of his intent to terminate, and waited to see the final results. He concluded that he could get around the finalized MCA and now seeks to justify his breach by a variety of unlikely interpretations and assertions. This was clearly contrary to the intent of the parties in providing that notice of extensions would be sent to individual employers and contrary to the parties' past practice as well. Therefore, the April 3 notice did not effect a termination of the MCA. The Union and the Association were empowered and even compelled to prevent the MCA from lapsing and they did so. Thus, the life of the MCA never ended, but was renewed upon the execution of the subsequent MCA of 1985 to 1988.

Inasmuch as the Memorandum Agreement bound the Defendant to all renewals and modifications negotiated by the Association and the Union made during the life of the incorporated MCA, the Memorandum

agreement never lapsed before the execution of the subsequent MCA. Therefore, the Defendant was never relieved of his duty to accept and comply with the renewed MCA. *See Ted Hicks, supra.*

## IV. CONCLUSION

The Court finds that the execution of the 1985–1988 agreement on April 23, 1985 substantially adopted the 1982–1985 MCA and was, in fact, a renewal of the 1982–1985 agreement. *Id.* The fact that it was to be applied retroactively in most respects as of April 1, 1985, demonstrates that the parties were in agreement that there was never a period of time in 1985 during which no MCA was in full force and effect. *Id.* The signatory parties—the Association and the Union—therefore had either explicitly or implicitly agreed to an extension of the prior MCA to avoid its termination before the execution of the MCA that was being negotiated, as required by Article XVII of the 1982–1985 MCA. The Defendant had agreed to comply with such extensions, unless it had filed timely notice of termination.

The MCA of 1982–1985 was in fact renewed and modified between the Union and the signatory Association, and was at no time terminated, whether by any party thereto, or by its own terms. As a corollary, the Memorandum Agreement was in full force and effect as of April 23, 1985, thereby binding the Defendant to the terms of the renewed MCA. Accordingly, the Court finds that the Defendant Employer is responsible to the Plaintiffs for any and all monies due pursuant to the agreement entered into and executed on April 23, 1985, and made retroactively effective from April 1, 1985, up to and including September 30, 1986.

ORDERED AND ADJUDGED that Final Judgment be entered in favor of the Plaintiffs on the issue of liability and that the parties shall make a good faith to stipulate as to the dollar amount of the Final Judgment and to submit a Final Judgment to the Court along with the stipulation and in conformity therewith, within 20 days of the date of this Order. Should the parties fail to do so, the parties shall prepare admissible affidavits as to the amount and shall so notify the Court to enable this matter to be set for a status conference as soon as possible.